UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY
Camden Division

| | |
|---|---|
| **Karen Tucker, Pro Se Plaintiff**<br>**JON DOE(S) PLAINTIFF(S)**<br><br>VS<br><br>**DEFENDANT(S)**<br>Levi Combs, III, Funeral Director Carl Miller Funeral HOME<br>Pamela Miller Dabney, President Carl Miller Funeral Home<br>Alexis Combs, Carl Miller Funeral Home<br>Carl Miller Funeral Home<br>JON DOE(S) DEFENDANT(S)<br>Virtua Health, Inc.<br>Dennis W. Pullin, CEO and President<br>JON DOE(S) DEFENDANT(S) | ) **Civil Docket No.** _____<br>)<br>) **JURY TRIAL DEMAND YES**<br>)<br>)<br>) negligence, breach of duty of care,<br>) intentional infliction of emotional<br>) distress based upon the mishandling<br>) of a corpse; negligent infliction of<br>) emotional distress based upon<br>) mishandling of corpse; Tort Action<br>) for Interference with a Dead Body,<br>) unlawful taking or possessing<br>) Flakewood Tucker, Jr. human remains;<br>) unlawful desecration of Flakewood<br>) Tucker, Jr., human remains; theft of<br>) body, abuse of corpse, Mutilation of<br>) corpse, Misplacement, Misidentification<br>) or Uncertainty about the whereabouts<br>) and fate of Flakewood Tucker, Jr.<br>) missing corpse; Mis delivery of human<br>) remains; 4.43 Consumer Fraud Act<br>) NJSA 56:8-184, 3.30E FRAUD —<br>) DECEIT, Negligent Misrepresentations<br>) Fraudulent Misrepresentations |

**DEMAND FOR JURY TRIAL**

The Plaintiff demands trial by a jury on all of the triable issues of civil procedures in both civil and criminal matters in this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35- 1(a).

Date: FEBRUARY 22, 2023

Karen Tucker, Pro Se Plaintiff electronic signature
Karen Tucker, pro se
One Erynwood Avenue
Marlton, NJ 08053
609-923-9086

ORAL ARGUMENT The Plaintiff demands oral argument to answer the courts questions and concerns to resolve any misconstruing, confusion, conflicts and misstatements, to correct any errors or mistakes and to supplement the record to prevent the court from construing, interpreting facts incorrectly presuming or formulating opinions incorrectly by any means of assumption, presumption or speculation of the evidence in this matter.

Date: FEBRUARY 22, 2023
Cc:  Carl Miller Funeral Home, Defendant(s) Home
831 Carl Miller Blvd. Camden, NJ 08104  (856) 365-2966
Levi Combs, III., Defendant(s)
Pamela Miller Dabney, Defendant(s)
Alexis Coombs, Defendant(s)
VIRTUA HEALTH, INC. DEFENDANT(S)  303 Lippincott Dr, Marlton, NJ 08053  (888) 847-8823
Pullin Dennis W. Pullin, President and CEO, Defendant(s)

Respectfully submitted,
Karen Tucker, pro dse
One Erynwood Avene
Marlton, NJ 08053
(609) 923-9086

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| KAREN TUCKER | Civil No. |
|---|---|
| Plaintiff(s), | |
| v. | Judge |
| Levi Coombs, Dennis Pullin, Virtua Healt, Inc | |
| Defendant(s). | |

**JOINT CERTIFICATION[1] OF THE CITIZENSHIP OF THE PARTIES IN DIVERSITY CASES[2]**

**PLAINTIFF(S):**

KAREN TUCKER
1 Erynwood Avenue
Marlton, NJ 08053

☒ Individual[3]
☐ Corporation[4]
☐ Partnership[5]
☐ Limited Liability Company[6]

State(s) of Citizenship
NEW JERSEY

JON DOE(S)

☒ Individual
☐ Corporation
☐ Partnership
☐ Limited Liability Company

State(s) of Citizenship
NEW JERSEY

☐ Individual
☐ Corporation
☐ Partnership
☐ Limited Liability Company

State(s) of Citizenship

In cases where one or more Plaintiffs are partnerships or LLCs, list all partners or members and their citizenship. This space should also be used where there are more than three Plaintiffs.

## DEFENDANT(S):

| Carl Miller Funeral Home, Defendant(s)<br>831 Carl Miller Blvd. Camden, NJ 08104<br>(856) 365-2966 | Individual<br>■ Corporation<br>☐ Partnership<br>☐ Limited Liability Company | State(s) of Citizenship<br>NEW JERSEY |
| --- | --- | --- |
| D. Levi Combs, III., Defendant(s)<br>831 Carl Miller Blvd. Camden, NJ 08104<br>(856) 365-2966 | Individual<br>■ Corporation<br>☐ Partnership<br>☐ Limited Liability Company | State(s) of Citizenship<br>NEW JERSEY |
| E. Pamela Miller Dabney, Defendant(s)<br>831 Carl Miller Blvd. Camden, NJ 08104<br>(856) 365-2966 | Individual<br>Corporation<br>☐ Partnership<br>☐ Limited Liability Company | State(s) of Citizenship<br>NEW JERSEY |

In cases where one or more Defendants are partnerships or LLCs, list all partners or members and their citizenship. This space should also be used where there are more than three Defendants.

F. ALEXIS COOMBS, Defendant(s)
  831 Carl Miller Blvd. Camden, NJ 08104  (856) 365-2966

G. JON DOE(S) DEFENDANT(S)

H. VIRTUA HEALTH, INC. DEFENDANT(S)  303 Lippincott Dr, Marlton, NJ 08053  (888) 847-8823

I. Pullin Dennis W. Pullin, President and CEO, Defendant(s) 303 Lippincott Dr, Marlton, NJ 08053
  (888) 847-8823

J. JON DOES(S), DEFENDANT(S)

## AMOUNT IN CONTROVERSY:

Amount in controversy, exclusive of interests and costs:[7] **$3,100,000.00**

Describe the basis of the calculation of amount in controversy. If the basis of the calculation refers to a "pleading, motion, order or other paper,"[8] include the ECF citation to the record.

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between— Karen Tucker, Plaintiff civil sues against the above-named parties Defendant(s) in the amount that exceeds $3,100,000 dollars.

28 U.S.C.A. § 1332(a) ( " The district courts shall have original jurisdiction of all civil actions where

the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs . . . " ); Auto –

Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 395 (3d Cir. 2016) ( " [T]he party invoking diversity

jurisdiction . . . bears the burden to prove, by a preponderance of the evidence, that the amount in

controversy exceeds $75,000. " (citing Judon v. Travelers Prop. Cas. Co. of Am., 773 F.3d 495, 506 – 07 (3d Cir. 2014).

I am the Plaintiff that presents exhibit 24. Karen Tucker Podiatry and Allopathic Medicine Economic & Earning Capacity Expert witness report prepared by Paul Sweeny, CPA shows Plaintiff ' s earning potential loss of $2,000,000 dollars ... .....(Pa)21 – 147-160;

Pursuant to 28 U.S.C. § 1746 and Fed. R. Civ. P. 11, I certify that the foregoing is true and correct.

KAREN TUCKER

Appearing on behalf of Plaintiff(s)

Date FEBRUARY 22, 2023

Date

Appearing on behalf of Defendant(s)

This form may be replicated as necessary. Additional sheets may be added.

3

¹ As of March 14, 2022, the Court has updated its preferences to require that this Joint Certification be executed by the parties and filed in diversity cases within 30 days of the filing of a Notice of Removal, or where the Complaint is initially filed in this Court, 30 days after an answer, other responsive pleading, or motion has been filed.

² Parties may not consent to jurisdiction, and federal courts have an independent obligation to address issues of subject matter jurisdiction *sua sponte* and may do so at any stage of the litigation. *Zambelli Fireworks MFG. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010); *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 104 (3d Cir. 2015) ("The principal federal statute governing diversity jurisdiction, 28 U.S.C. § 1332, gives federal district courts original jurisdiction of all civil actions ' between . . . citizens of different States' where the amount in controversy exceeds \$75,000. For over two hundred years, the statute has been understood as requiring complete diversity between all plaintiffs and all defendants, even though only minimal diversity is constitutionally required." (citation omitted)); *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 382 (1998) ("The presence of the nondiverse party automatically destroys original jurisdiction: No party need assert the defect. No party can waive the defect or consent to jurisdiction. No court can ignore the defect; rather a court, noticing the defect, must raise the matter on its own." (citation omitted)).

³ 28 U.S.C. § 1332(a)(1); *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 219 n.4 (3d Cir. 2012) (citing *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("[M]ere residency in a state is insufficient for purposes of diversity [of citizenship].")).

⁴ 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . ."); *S. Freedman & Co., Inc. v. Raab*, 180 F. App'x 316, 320 (3d Cir. 2006) (explaining that "'[i]n order to adequately establish diversity jurisdiction, a complaint must set forth with specificity a corporate party's state of incorporation and its principal place of business,'" and affirming dismissal of complaint alleging that corporation maintained "a principal place of business," rather than "its principal place of business" (quoting *Joiner v. Diamond M Drilling Co.*, 677 F.2d 1035, 1039 (5th Cir. 1982))). The parties are directed to list the state of incorporation and principal place of business of the corporation.

⁵ A partnership, as an unincorporated entity, takes on the citizenship of each of its partners. *Zambelli Fireworks MFG. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) (citation omitted). The parties are directed to list each partner and its citizenship.

⁶ The citizenship of an LLC is determined by the citizenship of each of its members. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015). The parties are directed to list each member and its citizenship.

⁷ 28 U.S.C.A. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of \$75,000, exclusive of interest and costs . . ."); *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016) ("[T]he party invoking diversity jurisdiction . . . bears the burden to prove, by a preponderance of the evidence, that the amount in controversy exceeds \$75,000." (citing *Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 506–07 (3d Cir. 2014))).

⁸ 28 U.S.C. § 1446(b)(3).

**UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY**
**Camden Division**

Karen Tucker, Pro Se Plaintiff
JON DOE(S) PLAINTIFF(S)

VS

**DEFENDANT(S)**
Levi Combs, III, Funeral Director Carl Miller Funeral HOME
Pamela Miller Dabney, President Carl Miller Funeral Home
Alexis Combs, Carl Miller Funeral Home
Carl Miller Funeral Home
JON DOE(S) DEFENDANT(S)
Virtua Health, Inc.
Dennis W. Pullin, CEO and President
JON DOE(S) DEFENDANT(S)

R E C E I V E D

FEB 2 2 2023

AT 8:30_____M
WILLIAM T. WALSH
CLERK

) Civil Docket No. _____
)          2023 FEB 22   P  3: 39
) **JURY TRIAL DEMAND YES**
)
)
) negligence, breach of duty of care,
) intentional infliction of emotional
) distress based upon the mishandling
) of a corpse; negligent infliction of
) emotional distress based upon
) mishandling of corpse; Tort Action
) for Interference with a Dead Body,
) unlawful taking or possessing
) Flakewood Tucker, Jr. human remains;
) unlawful desecration of Flakewood
) Tucker, Jr., human remains; theft of
) body, abuse of corpse, Mutilation of
) corpse, Misplacement, Misidentification
) or Uncertainty about the whereabouts
) and fate of Flakewood Tucker, Jr.
) missing corpse; Mis delivery of human
) remains; 4.43 Consumer Fraud Act
) NJSA 56:8-184, 3.30E FRAUD —
) DECEIT, Negligent Misrepresentations
) Fraudulent Misrepresentations

**COMPLAINT**

**I. Parties in this complaint:**

A.  Karen Tucker, Pro Se Plaintiff
    One Erynwood Avenue
    Marlton, NJ 08053
    (609) 923-9086

B.  JON DOE(S) PLAINTIFF(S)

C.  Carl Miller Funeral Home, Defendant(s)
    831 Carl Miller Blvd.  Camden, NJ 08104 (856) 365-2966

D.  Levi Combs, III., Defendant(s)
    Carl Miller Funeral Home 831 Carl Miller Blvd. Camden, NJ 08104 (856) 365-2966

E.  Pamela Miller Dabney, Defendant(s)
    Carl Miller Funeral Home  831 Carl Miller Blvd. Camden, NJ 08104  (856) 365-2966

1

F.  Alexis Coombs, Defendant(s)  Carl Miller Funeral Home 831 Carl Miller Blvd. Camden. NJ 08104
    (856) 365-2966

G.  JON DOE(S), DEFENDANT(S) Carl Miller Funeral Home 831 Carl Miller Blvd. Camden, NJ 08104
    (856) 365-2966

H.  VIRTUA HEALTH, INC. DEFENDANT(S)  303 Lippincott Dr, Marlton, NJ 08053  (888) 847-8823

I.  Pullin Dennis W. Pullin, President and CEO, Defendant(s) 303 Lippincott Dr, Marlton, NJ 08053
    **(888) 847-8823**

J.  JON DOES(S), DEFENDANT(S)  303 Lippincott Dr, Marlton, NJ 08053   (888) 847-8823

**II. Basis for Jurisdiction:**
Federal courts are courts of limited jurisdiction. There are four types of cases that can be heard in federal
court:
Federal courts are courts of limited jurisdiction. There are four types of cases that can be heard in federal
court: 1) Federal Question - Under 28 U.S.C. § 1331, a case involving the United States Constitution or
federal laws or treaties is a federal question case; 2) Diversity of Citizenship - Under 28 U.S.C. § 1332, a
case in which a citizen of one state sues a citizen of another state and the amount in damages is more than
$75,000 is a diversity of citizenship case; 3) U.S. Government Plaintiff; and 4) U.S. Government Defendant.

Diversity of Citizenship - Under 28 U.S.C. § 1332 (a)
The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds
the sum or value of $75,000, exclusive of interest and costs, and is between— Karen Tucker, Plaintiff civil
sues against the above-named parties Defendant(s) in  the amount that exceeds $3,100,000 dollars.

**A.  What is the basis for federal court jurisdiction? (check all that apply) Federal Questions**

**X 28 U.S. Code § 1331 – Federal Question**
**B. If the basis for jurisdiction is Federal Question**, what federal Constitutional, statutory or treaty right is
at issue? Federal Trade Commission (FTC) Funeral Rule Sec. 16 (CFR) code of federal regulations §
453.3 (a) (1) (i) (ii) Misrepresentations; Sec. 16 CFR § 453.5 Services provided without prior approval; 16
CFR § 453.8 - Declaration of intent; Federal Trade Commission (16 C.F.R. 453.2) and the board
(N.J.A.C.13:36-9.8). L.1993,c.147,s.1; amended 1994,c.163,s.1. 45:7-83.

**QUESTIONS:**

Whether Plaintiff(s) are the victims of Defendant(s) that had a duty of care that failed to perform duty of
care required to do as a Virtua Health, Inc. Defendant(s) are a public charity facility and Levi Coombs is a
state of New Jersey licensed Mortician operating Carl Miller Funeral Home are Defendant(s) that Plaintiff
can show cause of action for negligence, fraud, NJ Consumer Fraud Act, intentional infliction of emotional
distress based upon the mishandling of a corpse, negligent infliction of emotional distress based upon the
mishandling of a corpse; Tort Action for Interference with a Dead Body, Deceit, Omission of facts,
concealment and misrepresentation that shows Defendant(s) are liable for $50,000,000.00 million dollars
monetary damages as the proximate cause for statement of a claim for: negligence, breach of duty of care,
intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of

2

emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker. Jr. missing corpse: Mis delivery of human remains; , 4.43,Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT shows Defendant(s) are the proximate cause of deceit and omission of facts that cause Plaintiff to suffer intentional infliction of emotional distress, negligent infliction of emotional distress; emotional turmoil, insult, outrage, overwhelmed and post-traumatic stress disorder {PTSD} death of beloved cherished father Flakewood Tucker, Jr., fear of not being able to see or bury father, hopelessness, helplessness, mental anguish, devastated and destroyed the life of Plaintiff that has adversely affected Plaintiff's physical and mental health and professional career as a allopathic and podiatric physician by the Defendant(s) that had a duty of care, breached that duty required to do;

I am the Plaintiff that presents exhibit 24. Karen Tucker Podiatry and Allopathic Medicine Economic & Earning Capacity Expert witness report prepared by Paul Sweeny, CPA shows Plaintiff's earning potential loss of $2,000,000 dollars ……..(Pa)21–147-160;

I am the Plaintiff that presents exhibit 32 from the NJ Division of Consumer Affairs Active Podiatrist license verification letter as of April 23, 2022  for Karen Tucker and exhibit 33 Texas Dept of License Active verification April 23, 2022 Podiatrist letter for Karen Tucker that are clear and sufficient to establish and prove that a reasonable fact finder or jury could find Plaintiff's suffered harm, intentional infliction of emotional distress based upon the mishandling of a corpse, negligent infliction of emotional distress based upon the mishandling of her husband father, Flakewood Tucker, Jr. corpse that prevent Plaintiff from working is the proximate cause that shows Defendant(s) are liable for economic and earning capacity loss in the amount of $2,000,000.00 dollars for failure to perform duty of care to not abuse corpse, not loose corpse to deprive Plaintiff from opportunity to see and plan proper funeral and burial service for father Flakewood Tucker, Jr., not unlawfully take corpse or possession without authorization or notification to Plaintiff(s), not to prevent Plaintiff(s) opportunity to hold proper funeral and burial services for husband, father, son, brother, uncle, nephew, fraternity brother, friend, mentor, veteran, and colleague; not desecrate corpse, not abuse human remains, not conceal body, not omit facts and make false statements, negligent misrepresentation and fraudulent misrepresentation, not mishandle human remains and intentionally and negligently inflict emotional distress on Plaintiff(s) shows Plaintiff is entitled to move the Court for summary judgment Rule 56 or allow complaint to proceed for jury trial demand heard on the merits for any reason to prevent manifest injustice, prejudice injustice, travesty of justice, miscarriage of justice or to achieve justice.

I am the Plaintiff that can show if she could work her earning potential as a licensed Podiatrist starting salary earning potential is $80,000.00 dollars  - $350,000.00 dollars per year exceeds the $75,000.00 dollars requirement under 28 U.S.C. § 1332.  Plaintiff cannot meet subject matter jurisdiction requirements for diversity because all Defendant(s) are from the state of New Jersey like Plaintiff.

Whether Plaintiff can show she is entitled to civil suit for  monetary damages, damages and relief for statement of a claim against Defendant(s) for Negligence, , 4.43 Consumer Fraud Act NJSA 56:8-184 et seq, 3.30E FRAUD — DECEIT,  Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecration, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body  Abuse of Corpse,

3

Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse; and Mis delivery of human remains.

I am the Plaintiff that can show Defendant(s) abused trust and breached duty of care. committed acts of fraud, greed and/or corruption; Defendant(s) Carl Miller Funeral Home requested copies of Flakewood Tucker, Jr., death certificate and embalmed him without authorization that shows unlawful taking or possession of human remains, unlawful desecration of human remains, Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body in violation of NJ Admin. Code 8:2A-1.1 – 8:2A-1.2 are the proximate cause of violations laws (stated above and below) of FTC Funeral Rules, state of NJ Board of Mortuary Science rules, regulations and laws 45:7-65.5; 13:36-9.2 45:7-95, 45:7-33, 45:7-63, 13:36-1.9., 13:36-9.2, 13:36-9.8, 13:36-9.17, 13:36-9.19, 13:36-11.15; N.J.A.C. 13:36-1.9(a); 4.43 Consumer Fraud Act NJSA 56:8-184 et seq., N.J.S.A. 45:27-22, N.J.A.C.13:36-9.8, and N.J.S.A. 45:27-22; § 2C:20-3(a); § 2C:20-2(e); § 2C:22-1(a)(1); § 2C:22-1(a)(2)

I am the Plaintiff(s) that can shows basis for claims against the Defendant(s)that show they violated a law that governs the funeral and disposition of decedents entitles Plaintiff to civil suit against Defendant(s) for statement of claim for negligence, fraud, Tort Action for Interference with a Dead Body, intentional infliction of emotional distress based upon the mishandling of a corpse, negligent infliction of emotional distress based upon the mishandling of a corpse NJ Consumer Fraud ACT, Negligence, Breach of Duty of Care that shows monetary damage, compensatory damages, treble damages, punitive damages, relief, summary judgement Rule 56 can be granted, extraordinary relief and any alternative relief this court deems both just and proper.

Whether Plaintiff(s) are the victims of violations verbal communication with the Defendant(s) that only discussed the cost of funeral services shows a violation of FTC Funeral Home Rules, Regulations and other laws against the Defendant(s) that provided services to retrieve and embalm body without prior approval;

Whether Plaintiff(s) are the victims that can show against the Defendant(s) violations of FTC Funeral Home Rules, Regulations and other Laws against Defendant(s) that did not offer an oral or written funeral contract, Plaintiff(s) did not enter, agree or accept any services to be provided by Carl Miller Funeral Home, Defendant(s) by any other means or channel of communication that include verbal, written or electronic authorization, and no written contract was offered by Defendant(s), entered or accepted by Plaintiff(s) for Mr. Flakewood Tucker, Jr. can show Defendant(s) knowingly, willfully, intentionally and negligently with wanton disregard for FTC Funeral Rules, 4.43 Consumer Fraud Act NJSA 56:8-184 et seq., N.J.S.A. 45:27-22, death of loved one abused trust, abused body, mishandled body, retrieved body unknowing to Plaintiff(s) that was notified by contracted May's Funeral Home the body was missing from Defendant(s) Virtua Health, Inc., Our Lady of Lourdes Hospital on Friday, February 25 -28, 2022; and Defendant(s) embalmed body without any authorization;

Whether Plaintiff(s) are the victims that can state a claim against the Defendant(s) Carl Miller Funeral Home deceptive practices under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-184, et seq. ("NJCFA"), the New Jersey Truth-in-Consumer Contract;

Whether Plaintiff(s) are the victims that can hold the Defendant(s) accountable for statement of a claim for negligence and/or liable for entitlement to the right to civil suit against Defendant(s) professional business

4

insurance, professional personal insurance, real property or assets or cash on hand for monetary damages in the amount of fifty million dollars, damages, compensatory damages, emotional damages, treble damages, punitive damages, relief, preliminary or permanent injunction to punish and prevent Defendant(s) misconduct that could cause harm to other grieving consumers that make inquiries about funeral cost for services; that includes the injuries suffered by Plaintiff(s) proximately caused by the Defendant(s) prohibited conduct under the NJ Consumer Fraud Act.

Whether Plaintiff can state a claim against Defendant(s) under New Jersey, common-law fraud that show:
(1) Defendant(s) made a material misrepresentation of a presently existing or past fact;
(2) knowledge or belief by the Defendant(s) of its falsity;
(3) Defendant(s) intention that Plaintiff(s), The Camden Police Department and The Court rely on it;
(4) reasonable reliance thereon by Plaintiff(s), The Camden Police Department and The Court;
(5) resulting damages and harm to Plaintiff(s) for **statement of a claim** against Defendant(s) for Negligence, , 4.43 Consumer Fraud Act NJSA 56:8-184 et seq, 3.30E FRAUD — DECEIT,  Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse,
Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse;
Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker. Jr., Human Remains; Theft of Body. Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr.  Missing Corpse;  and Mis delivery of human remains.

Whether Plaintiff can state a claim against the Defendant(s) under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 – 56:8-184 (the "Consumer Fraud Act" or the "NJCFA"), that renders it unlawful for any person like Virtua Health Inc., Defendant(s), Dennis Pulliam, Defendant(s), Hon Doe(s), Defendant(s) or Carl Miller Funeral Home Defendant(s), Levi Coombs, Defendant(s), Pamela Dabney, Defendant(s), Alexis Coombs, Defendant(s) to "use or employ[] . . . any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation," or to "knowing[ly] conceal[], suppress[], or omi[t] . . . any material fact with intent that others like Tucker, Plaintiff(s), the Camden Police Department or the Courts rely upon . . . [that] concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . NJCFA § 2, N.J.S.A. § 56:8-2.

Whether Plaintiff state a claim against Defendant(s) under the Consumer Fraud Act, Fraudulent misrepresentation and negligent misrepresentation.

I am a private litigant that has met burden of proof to establish:
(1) unlawful conduct by Defendant(s),
(2) an ascertainable loss on the part of the plaintiff, and
(3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 367 N.J. Super. 8, 12-13 (N.J. App. Div. 2003); *see also* NJCFA § 7, N.J.S.A. § 56:8-19.

Plaintiff(s) are a private litigant(s) who has met burden of proof to prove claims under the New Jersey Consumer Fraud Act is entitled to recover three times the damages sustained by Tucker, Plaintiff(s), and reasonable attorneys' fees. *See* NJCFA § 7, N.J.S.A. § 56:8-19.

Whether Plaintiff(s) are the victims that can state a claim against the Defendant(s) for NJ Consumer Fraud Act and or subjected to use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person whether or not any person has in fact been misled, deceived or damaged. I am the Plaintiff seeking Fifty million dollars monetary damages, damages, relief, extraordinary relief and any alternative relief this court deems both just and proper to achieve justice and prevent manifest injustice and miscarriage of justice.

Whether Plaintiff can state a claim for 3.30E FRAUD — DECEIT against Defendant(s) that shows Plaintiff is entitled to seeks to recover damages which he/she claims he/she sustained as a result of a misrepresentation made to him/her by the Defendant(s). One who represents as true that which is false with the intent to deceive the person to whom the representation is made is liable to that person if he/she, believing the representation to be true (acts, refrains from acting) in justifiable reliance upon it and suffers damage as a result.

Whether Plaintiff can show the criminal liability against Defendant(s) unlawfully taking or possessing Flakewood Tucker, Jr. human remains?

Whether Plaintiff can state a claim against Defendant(s) for unlawfully taking or possessing human remains and funerary objects, generally, human remains and funerary objects can be considered movable property and therefore persons like all the Defendant(s) can be guilty of theft showing they unlawfully transfers Flakewood Tucker, Jr. human remains with the purpose of benefiting himself like Defendant(s) acts to force Plaintiff to pay money for unauthorized funeral services like transportation, body preparation, embalming and burial services or another like Defendant(s) who was not entitled to possession either. § 2C:20-3(a).

Whether Plaintiff can show also, if the Court finds Flakewood Tucker, Jr. human remains were stolen, it is considered theft of the second degree, the remains were stolen by Defendant(s) by deception or falsification to remove corpse from Defendant(s) possession located at Virtua Hospital Our Lady of Lourdes 1600 Haddon Ave, Camden, NJ 08103 without authorization from Plaintiff or of a document by which a gift of part of a human body was to be made, then it is a crime of the first degree. § 2C:20-2(e).

Whether Plaintiff that can state a claim against Defendant(s) for state criminal laws for abuse of corpse: It is a second-degree offense to unlawfully disturb, move, or Flakewood Tucker, Jr., conceal human remains. § 2C:22-1a(1). Plaintiff can show Defendant(s) are the proximate cause of a 2cm x 1cm open wound in Flakewood Tucker, Jr. forehead that pictures exculpatory material evidence can show was not present at time of death and Defendant(s) were not authorized to embalm Flakewood Tucker, Jr. corpse shows a second degree offense against Defendant(s) that unlawfully desecrate, damage or destroy human remains. 'Desecrate' means to deface, damage or pollute. § 2C:22-1(a)(2). Finally, it is a second degree offense if an actor commits an act of sexual penetration or sexual contact upon human remains. § 2C:22-1(a)(3). See § 2C:14-1 for definitions of sexual penetration and sexual contact.

Whether Plaintiff that can state a claim against the Defendant(s) for general state criminal laws for theft: Theft constitutes a crime of the first degree showing Defendant(s). Plaintiff can show Flakewood Tucker, Jr. human remains were stolen by deception or falsification by Defendant(s) of a document by which a gift of all or part of a human body can be made pursuant to the Revised Uniform Anatomical Gift Act as defined

6

by § 26:6-77. Theft is also a crime of the first degree if human remains are taken by extortion as defined in § 2C:20-5. § 2C:20-2.

Whether Flakewood Tucker. Jr cornea B/L or other body parts removed without authorization showing Defendant(s) stated they loss of the body Flakewood Tucker, Jr, had no record of his hospitalization, death or removal of remains on February 22, 2022- February 28, 2022.

Whether Plaintiff can **state a claim against Defendant(s) for Theft** that constitutes a crime of the second degree if the amount involved is $75,000.00 or more, the property is taken by extortion as defined in § 2C:20-5. § 2C:20-2.
Theft constitutes a crime of the third degree if the amount involved exceeds $500.00 but is less than $75,000.00, the property stolen is a firearm, motor vehicle, vessel, boat, horse, domestic companion animal or airplane, it is from the person of the victim, it is in breach of an obligation by a person in his capacity as a fiduciary, it is by threat not amounting to extortion, it is of a public record, writing or instrument kept, filed or deposited according to law with or in the keeping of any public office or public servant. § 2C:20-2.

Theft constitutes a crime of the fourth degree if the amount involved is at least $200.00 but does not exceed $500.00. § 2C:20-2.
Theft constitutes a disorderly persons offense if the amount involved was less than $200.00. § 2C:20-2.

Whether Plaintiff can state a claim against Defendant(s) for **Tort Action for Interference with a Dead Body:**
Under the common law, a person like Defendant(s) commits a tort when he or she intentionally, recklessly, or negligently removes, withholds, mutilates, or operates upon the body of Flakewood Tucker, Jr., a dead person or when he or she prevents the proper burial or cremation of the dead body. The person who commits this tort is liable for damages to the family member or members of the deceased person.

*I am the Plaintiff that is entitled to recover damages for the tort of interference with Flakewood Tucker, Jr.,* dead body, Anita Tucker is the wife and Karen Tucker is the daughter that lived with Flakewood Tucker and are named in his will;  we are the family member or members of the deceased person entitled to the disposition of Flakewood Tucker, Jr., the deceased person's body.

In most states, the surviving spouse Anita Tucker is generally the person who is deemed to be entitled to the disposition of Flakewood Tucker, Jr. the deceased person's body.

Anita Tucker, is the deceased wife; Karen Tucker, Plaintiff(s) is Flakewood Tucker. Jr. the deceased person's daughter/relative that was present when there was interference with the deceased person's body, that relative may be entitled to damages for his or her emotional distress.

Restatement (Second) of Torts § 868 comment a (1977); Annotation, Liability for Withholding Corpse, 48 ALR 3d 240, 252-53 (1973).

### 28 U.S. Code § 1391 - Venue generally
*The United States District Court for the District of New Jersey (in case citations, D.N.J.) is* **a federal court in the Third Circuit** (except for patent claims and claims against the U.S. government under the Tucker Act, which are appealed to the Federal Circuit).

7

(a). Applicability of Section.—Except as otherwise provided by law—

(1). this section shall govern the venue of all civil actions brought in district courts of the United States; and

(2). the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.

(b). Venue in General.—A civil action may be brought in—

(1). a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2). a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3). if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

(c). Residency.—For all venue purposes—

(1). a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

(2). an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

(3). a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

## PERSONAL JURISDICTION
I am the Plaintiff that can show personal jurisdiction gives the NJ District Court, Camden the authority to determine the rights and liabilities of a person or entity, such as a corporation or partnership, involved in a lawsuit.

I am the Plaintiff that can show the NJ District Court can entertain a plaintiff's claim jurisdiction over the parties Karen Tucker, Plaintiff(s) and Jon Doe(s) Plaintiff(s) vs Defendant(s) and Jon Doe(s), Defendant(s):

Carl Miller Funeral Home, Defendant(s), Levi Combs, Defendant(s), Pamela Miller Dabney, Defendant(s), Alexis Coombs, Defendant(s), Jon Does(s), Defendant(s)
Virtua Health, Inc., Defendant(s), Pullin Dennis W. Pullin, President and CEO, Defendant(s)
Jon Doe(s), Defendant(s) or things (usually referred to as personal jurisdiction);
831 Carl Miller Blvd. Camden, NJ 08104
303 Lippincott Dr, Marlton, NJ 08053

jurisdiction over the subject matter; and proper venue.

Subject matter is the cause, the object, the thing in dispute. The authority of a court to decide a particular type of case is called subject- matter jurisdiction and is set by the federal or state Constitution, or by state statutes.

## NATURE OF SUIT
360 Other Personal Injury Action primarily based on personal injury or death caused by negligence or intentional misconduct, including suits brought against the United States under the Federal Tort Claims Act, and which cannot be classified under any other nature of suit.

## CAUSE OF ACTION
Plaintiff can show Causes of Action against the Defendant(s) for: negligence, intentional infliction of emotional distress, fraud, and misrepresentation.

## III. STATEMENT OF A CLAIM
State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary

A pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2).

I am the Plaintiff that can present facts supported by factual exculpatory material evidence presented in discovery and interrogatories that are clear and convincingly sufficient to establish and prove that a reasonable fact finder or juror could find Defendant(s) guilty, proximate cause of harm to Plaintiff(s) are liable for fifty million dollars monetary damages to Plaintiff(s) that entitles Plaintiff(s) to civil suit against Defendant(s) for statement of a claim for:
1. Negligence
2. 4.43 Consumer Fraud Act NJSA 56:8-184 et seq
3. 3.30E FRAUD — DECEIT
4. Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse,
5. Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse;
6. Tort Action for Interference with a Dead Body,
7. Negligent misrepresentation
8. Fraudulent Misrepresentation
9. Breach of Duty of Care,
10. Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains;
11. Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains;
12. Theft of Body,
13. Abuse of Corpse,
14. Mutilation of corpse,
15. Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse;
16. Mis delivery of human remains

## SHORT PLAIN STATEMENT (Rule 8(a)(2) has no length restriction)

I am the Plaintiff that can show the Virtua Defendant(s) delayed care caused Flakewood Tucker, Jr. death. Defendant(s) conceal and omitted facts that they lost body and mishandled human remains of Flakewood Tucker. Jr and caused Plaintiff(s) harm that was intentional infliction of emotional distress, negligent infliction of emotional distress that caused Plaintiff(s) fear that they would never see beloved husband, father and son again; and be deprived from their right to provide a proper funeral and burial service.

I am the Plaintiff that can show the Carl Miller Funeral Home, Defendant(s) concealed and omitted facts that without contract, verbal or written authorization they stole body, unlawfully had taken, embalmed, desecrated and abused the human remains of Flakewood Tucker, Jr and caused Plaintiff harm and fear that they would never see their beloved husband, father and son again; and be deprived from their right to provide a proper funeral and burial service was intentional infliction of emotional distress based on the mishandling of a corpse, negligent infliction of emotional distress based on the mishandling of a corpse.

## I. STATEMENT OF CLAIM AND FACTS

I am the Plaintiff that called Virtua Health, Inc., Defendant(s) Dr. Ashraf Hussein Malek attending gastroenterology-hepatology-renal group physician to ask if Tucker, Plaintiff(s) should take Flakewood Tucker, Jr. to his Cooper Hospital Gastroenterology Tuesday, February 15, 2022 appointment or bring him to Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital where Dr. Malek was on staff and working on Tuesday, February 15, 2022 because he vomited small amount of blood.  Virtua Health, INC., Defendant(s) Dr. Malek evaluated Flakewood Tucker, Jr. at his office on Monday, February 14, 2022 and did not recommend emergency hospital care although he presented with signs and symptoms of portal hypertension.

Virtua Health, Inc., Defendant(s) Dr. Malek stated that he was at  Virtua Health, Inc., Defendant(s) Hospital Our Lady of Lourdes on call in the Emergency room and preferred Plaintiff bring Flakewood Tucker, Jr., to the hospital right away for a direct surgical admit for endoscopy he ordered written in the chart performed by his group that did not occur for 72 hours after he had a massive bloody vomit called Hematemesis, was found by Plaintiff in the hospital, unconscious, no mentation, hanging off bed, roommate stated he called out for the nursing staff and pushed the call button from around 3:00 am-7:30 am and no one responded for hours until 7:30 am on February, 17, 2022 the endoscopy varices banding was performed at 2:00 to late on a unconscious, no mentation, unresponsive Flakewood Tucker, Jr. finding bleeding esophageal varices and blood in stomach and intestines that can show that Virtua Health, Inc., Defendant(s) delayed care to perform emergency GI endoscope to surgically repair bleeding esophageal varices that Plaintiff had to beg, plead and cry for Virtua Health, Inc., Defendant(s) Tusharsindh Chauhan MD, Gastroenterology-Hepatology team to perform the procedure; delayed care reduced Flakewood Tucker, Jr., patient's responsiveness to treatment, affect the possibility of recurrences, and reduced his chance of survival. Virtua Health, Inc., Defendant(s) Dr, Chauhan stated he never saw or read Virtua Health, Inc., Defendant(s) Dr. Malek emergency room order for evaluation of for endoscope for surgical intervention and repair.  Virtua Health, Inc., Defendant(s) Dr. Yesenia Galan, MD, Nephrologist confirmed she saw and read Virtua Health, Inc., Dr. Malek order that was written in the chart shows that Virtua Health, Inc., Defendant(s) that caused delay of care for Flakewood Tucker, Jr., was the proximate cause of hemorrhagic shock that keeps your organs like kidneys from getting enough blood oxygen to patient Flakewood Tucker, Jr.,  Flakewood Tucker, Jr., condition needs to get treated right away, because it can cause increase lactic acid/metabolic acidosis, organ failure and death that occurred on February 22, 2022 that caused Plaintiff shock, anger,

10

hurt, hopelessness, helplessness, anxiety, pain, heart palpitations, inflicted emotional distress and mental anguish as a devastated daughter helpless and hopeless physician witness.

A reasonable physician evaluating a patient like Flakewood Tucker. Jr.. presenting with a medical emergency of portal hypertension and first esophageal varices bleed would perform emergency endoscope varices band procedure because to do nothing or a 72 hour delay would more likely than not result in hemorrhagic shock increased risk of acute kidney injury, kidney damage or even sudden death like Flakewood Tucker, Jr. suffered.

On Friday February 25, 2022, Plaintiff met with the Department of Veterans Affairs to make burial arrangement at Washington Crossing National Cemetery located in Upper Makefield Township, in Bucks County, Pennsylvania 830 Highland Rd, Newtown, PA 18940. On Friday, February 25, 2022, Plaintiff hired Mays Funeral Home Director to perform funeral services and provide transportation of Flakewood Tucker, Jr. from the morgue at Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital to Mays Funeral Home 45 Pine Street Willingboro, New Jersey and provide transportation to the cemetery for a military burial service. On February 25 – 28, 2022 Mays Funeral Home could not find Flakewood Tucker, Jr human remains at Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital. On Monday, February 28, 2022 Plaintiff was called by Mays Funeral Home and informed that they could not find Flakewood Tucker, Jr. body at Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital inside and outside morgue nor any local morgues.

Plaintiff(s) were outraged, devastated, horrified and mortified. Plaintiff(s) immediately contacted Virtua Health, Inc., Defendant(s) Hospital Our Lady of Lourdes Mr. Nettles, CEO, office and he connected Plaintiff to speak with Tracy Cannon, Virtua Health, Inc., Defendant(s) that told Plaintiff that they did not have Flakewood Tucker, Jr. body. They did not have any records of him dying at Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital on February 22, 2022 nor was he listed as a patient. Virtua Health, Inc., Defendant(s) Security Guards did not have any recorded signatures or dates for the body of Flakewood Tucker, Jr., being stored or picked up in the inside or outside hospital morgue.

MR. FLAKEWOOD TUCKER, JR
One Erynwood Avenue
Marlton, NJ 08053
DECEASED February 22, 2022
Virtua Health Inc. Defendant(s) Our Lady of Lourdes Hospital. Camden, NJ
What took place with the removal of Mr. Flakewood Tucker, Jr. from his place of death?

Plaintiff does not know who signed, what day or time Flakewood Tucker, Jr. nor what date the body was removed from Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital located at 1600 Haddon Ave, Camden, NJ 08103.

I am the Plaintiff(s) that can show Anita Tucker, wife and Karen Tucker, daughter were with our beloved Flakewood Tucker, Jr., until he took his last breath and was prepared to be removed to the hospital morgue.

Plaintiff(s) can show Flakewood Tucker died on Tuesday, February 22, 2022 at Virtua Health, Inc., Defendant(s) our Lady of Lourdes Hospital room ICU 1122 AT 6:20 AM he was pronounced dead.

11

Flakewood Tucker, Jr., and Plaintiff(s) were born and raised in Newark New Jersey and have the majority of family relationships in Northern New Jersey.

On February 24, 2022 Plaintiff(s) : were advised to contact the Department of Veterans Affairs to schedule an appointment for burial services at the VA Cemetery to discuss burial proceedings and internment locations at the following cemeteries:
Arlington National Cemetery Arlington, VA.
Washington Crossing National Cemetery located at 830 Highland Rd, Newtown, PA 18940
Brigadier General William C. Doyle Memorial Cemetery
350 Province Line Rd, Wrightstown, NJ 08562

We were instructed by the DAV not to make any contract commitments with any funeral homes until after our scheduled meeting on Friday, February 25, 2022.

On February 24, 2022 Plaintiff called the following funeral homes for an estimated cost for funeral services, burial services and transportation without making any verbal or written financial contracts with any of the following mortuary homes contacted:
Whigham Funeral Home 580 Dr. Martin Luther King Jr. Blvd., Newark, NJ 07102 Phone: (973) 622-6872

Perry's Funeral Home 34 Mercer Street, Newark, NJ 07103 Phone: (973) 824-9201

Cotton Funeral Home 1025 Bergen St, Newark, NJ 07112 Phone: (973) 926-6400
G. G. Woody Funeral Home, LLC 206 East 8th Avenue, Roselle, New Jersey 07203 Phone: (908) 245-6800

Bradley Funeral Home Address: 601 Route 73 S, Marlton, NJ 08053 Phone: (856) 983-1005

Carl Miller Funeral Home 831 Carl Miller Blvd, Camden, NJ 08104 Phone: (856) 365-2966

May's Funeral Home 45 Pine St, Willingboro, NJ 08046 Phone: (609) 871-3000

TL Hutton Funeral Services 869 Beverly Rd, Burlington, NJ 08016 Phone: (609) 239-4477

On February 25, 2022 Plaintiff(s) met with the DAV: Department of Veterans Affairs, filed paperwork, confirmed internment and burial services at:
Washington Crossing National Cemetery located: at 830 Highland Rd, Newtown, PA 18940.

I am the Plaintiff(s) that can show after our meeting with the Department of Veterans Affairs Plaintiff(s) made courtesy calls to all the funeral homes contacted to inform them that we were not going use there facility for funeral and burial services including the Defendant(s) Carl Miller Funeral Home agents Levi Coombs, Pamela Miller Dabney, and Alexis Coombs on Friday, February 25, 2022 approximately between 1:00 PM prior to entering into contract with May's Funeral Home Director and to make payment.

Plaintiff(s) met with May's Funeral Home on February 25, 2022, to enter into a written financial contract for them to provide itemized Funeral Services that included transportation of Flakewood Tucker, Jr., body from Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital Morgue Camden after our contract negotiation meeting. Mays Funeral Home agreement documented that they would wash the body, bless him, embalm him, dress him, order coffin and accessories Plaintiff's chose, hold live in person funeral

12

services for family and friends, live stream services for those that could not attend and transport body to Washington Crossing National Cemetery for military burial services.

Plaintiff's picked out a coffin and was educated on how the entire process is conducted and Plaintiff's paid May's Funeral Home for Funeral and Burial Services.

On Monday, February 28, 2022 Plaintiff(s) received a telephone call from Mays Funeral Home Director that informed Plaintiff(s) that they could not find Flakewood Tucker, Jr., body at Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital inside and outside morgue nor any local morgues including Carl Miller Funeral Home, Defendant(s) facility was contacted by Mays Funeral Home.

Plaintiff(s) were devastated, horrified, outraged and mortified. Plaintiff(s) immediately contacted Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital and was told by Mr. Nettles, CEO and Tracey Cannon that they did not have Flakewood Tucker, Jr., body. Defendant(s) did not have any records of Flakewood Tucker, Jr., dying at Defendant(s) Virtua Health, Inc. Defendant(s) Our Lady of Lourdes Hospital on February 22, 2022 nor was Flakewood Tucker, Jr., listed as a previous patient. Virtua Health. Inc., Defendant(s) Security guards stated that they did not have any recorded signatures or dates of Flakewood Tucker, Jr., body being stored or picked up in the Virtua Health, Inc., Defendant(s) inside or outside hospital morgue.

Plaintiff(s) were told that Virtua Health, Inc., Defendant(s) Pathologist did not have any records nor any signed documents that showed Flakewood Tucker, Jr. body was brought to the Virtua Health, Inc., Defendant(s) our Lady of Lourdes hospital morgue.

I am the Plaintiff that called and spoke with the Defendant(s) Virtua Health, Inc., Our Lady of Lourdes Hospital CEO Mr. Nettles and Tracy Cannon, assistant that told Plaintiff that they did not have Flakewood Tucker, Jr., body and Plaintiff would have to find Flakewood Tucker, Jr., on her own.

Plaintiff called funeral homes in Essex, Union, Burlington and Camden County and discovered that Defendant(s) Carl Miller Funeral Home had illegally unlawfully taken Flakewood Tucker, Jr. body without any verbal or oral authorization or permission, no financial commitment and made no attempts to contact or notify the Flakewood Tucker, Jr. Family: Anita Tucker (wife) nor Dr. Karen Tucker (daughter) that they had his human remains.

Plaintiff's feared and was so afraid that even if they found Flakewood Tucker, Jr. they would not be allowed to see him again nor have an open casket for the family because he was not embalmed, maybe not refrigerated properly; missing, mishandled and abused for seven days after death.

I am the Plaintiff(s) that discovered due to due diligence that Defendant(s) Carl Miller Funeral staff concealed and omitted facts to the Camden Police Department that they had oral authorization or that they did not need authorization to retrieve Flakewood Tucker, Jr., body that turned out to be a false statement the Camden Police department justifiably relied upon to not file criminal unlawful taking or possession of human remains, theft, Tort of Interference with a Dead Body and abuse of a corpse criminal charges against the Carl Miller Funeral Home, Defendant(s) and failed to file charges against Virtua Health, Defendant(s) for Tort of Interference with a Dead Body, intentional mishandling of a corpse that caused Plaintiff infliction of emotional distress, negligent mishandling of a corpse that caused Plaintiff infliction of emotional distress, abuse of a corpse that caused Plaintiff infliction of emotional distress.

13

I am the Plaintiff that discovered Flakewood Tucker, Jr., body was located at Carl Miller Funeral Home. Defendant(s) mortician Levi Coombs, Alexis Coombs, Pamela Dabney told Plaintiff on the telephone that they picked up Flakewood Tucker, Jr. body from Defendant(s) Virtua Health Our Lady of Lourdes Hospital by mistake and had no information how to contact family shows Defendant(s) are the proximate cause of Negligence, , 4.43 Consumer Fraud Act NJSA 56:8-184, 3.30E FRAUD — DECEIT, Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse,
Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse;
Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care,  Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body,  Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse;  Mis delivery of human remains shows Defendant(s) violated criminal laws, made a false statement, negligent misrepresentation and fraudulent misrepresentation to the Camden Police Department is fraud, deceit and NJ Consumer Act fraud.

Carl Miller Funeral Home agents Levi Coombs, Alexis Coombs, Pamela Dabney, Defendant(s) told Plaintiff on the telephone that they did not embalm Flakewood Tucker, Jr., body that turned out to be false statement used for justifiable reliance that Flakewood Tucker, Jr., would require cremation and closed coffin terrified Plaintiff(s).

Defendant(s) told Plaintiff on the telephone that they were not charging for storage or transportation picking up of Flakewood Tucker, Jr., body from Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital Morgue shows they concealed and omitted facts, made false statements, negligent misrepresentations and fraudulent misrepresentations to Plaintiff about the whereabouts and mishandling and interference of Flakewood Tucker, jr. corpse that shows Defendant(s) was the proximate cause of Plaintiff(s) harm, intentional and negligent infliction of emotional distress shows Defendant(s) are liable for Damages for statement of claim for: Negligence, , 4.43 Consumer Fraud Act NJSA 56:8-184; 3.30E FRAUD — DECEIT; Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Mis delivery of human remains, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse that shows Plaintiff is entitled to civil suit against Defendant(s) for fifty million dollars monetary damages, compensatory damages, economic and earning capacity damages, emotional damages, treble damages, punitive damages, relief, summary judgment Rule 56, extraordinary relief, any other alternative relief the court deems both just and proper to allow this complaint to proceed for jury trial demand heard on the merits for any reason to prevent manifest injustice, travesty of justice and miscarriage of justice.

Defendant(s) told Plaintiff if we were not going to use Carl Miller Funeral Services we must come retrieve – pick up Flakewood Tucker, Jr. body on Monday, February 28, 2022 at our own expense or he would be discarded caused Plaintiff harm, intentional infliction of emotional distress based on the mishandling of corpse and negligent infliction of emotional distress based upon the mishandling of a corpse.

May's Funeral Home retrieved Flakewood Tucker, Jr., body from Defendant(s) Carl Miller Funeral Home and discovered Defendant(s) Carl Miller Funeral Home did embalm the body without Plaintiff(s)

authorization, Flakewood Tucker, Jr., body had been injured because he was dropped and you could see a large gash open wound on his forehead and face shows Defendant(s) was the proximate cause of harm to Plaintiff shows Defendant(s) are liable for damages for statement of a claim:  Negligence, ,. 4.43 Consumer Fraud Act NJSA 56:8-184: 3.30E FRAUD — DECEIT: Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr.  Missing Corpse; Mis delivery of human remains that shows Plaintiff is entitled to civil suit against Defendant(s) for fifty million dollars monetary damages, compensatory damages, economic and earning capacity damages, emotional damages, treble damages, punitive damages, relief, summary judgment Rule 56, extraordinary relief, any other alternative relief the court deems both just and proper to allow this complaint to proceed for jury trial demand heard on the merits for any reason to prevent manifest injustice, travesty of justice and miscarriage of justice.

I am the Plaintiff(s) that was in shock and emotionally distressed, and outraged when we saw the harm and injuries to Flakewood Tucker, Jr., body he was almost unrecognizable because he was so black. Plaintiff(s) were with Flakewood Tucker, Jr., during his final transition and have pictures that prove he was not black in color in life or death, he did not have a gash open wound on his forehead or on his face and his body was not disfigured in life nor at the time of death 6:20 am February 22, 2022.  Plaintiff(s) are consumed with grief, guilt, helplessness and hopelessness as a physician that failed to get standard of care for father in life and human dignity in death for Flakewood Tucker, Jr. shows Defendant(s) breach of duty of care as a hospital and mortician is the proximate cause of Plaintiff(s) heart break syndrome, sleep deprivation, exasperated pain of clinical diagnosis, and cause of new clinical diagnosis, feeling of anxiety, failure and guilt to prevent lack of quality immediate care for Flakewood Tucker, Jr, showing Defendant(s) are the proximate cause  of the delayed care that caused imminently caused organ failure and death of our *beloved husband, father, son, uncle, cousin, friend and good man that was kind, giving, helpful and loving* to everyone he met became his friend or he was their mentor.  Defendant(s) are the proximate cause of Flakewood Tucker, Jr., delayed care that resulted death; Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital and Carl Miller Funeral Home mortician Levi Coombs failed to perform duty to honor the life of deceased Flakewood Tucker, Jr., President Pamela Dabney and Alexis Coombs Defendant(s) showed no responsibility for individual wellbeing, welfare, compliance and good practice; showed no empathy, no care and no remorse concealing and omitting facts for failing to disclose location of body and deceit mishandling body tortured Plaintiff(s) was unlawful and un-justifiable are proximate cause of Plaintiff(s) excessive pain, fear, helplessness, hopelessness, and loss, economic and earning capacity loss and lack of desire to practice medicine or health care in the profession Plaintiff(s) loves to help people; that has cause excessive suffering, mental anguish, unnecessary unlawful taking and desecration of Flakewood Tucker, Jr., corpse that was harmful and hurtful inhumane treatment of Flakewood Tucker, Jr. human remains; inhumane treatment of Plaintiff(s); his family, wife, daughter, son, mother, brothers and sisters, nieces, nephews, cousins, fraternity brothers, friends and colleagues was unwarranted, unlawful mishandling, unlawful taking and possession, misplacement, abuse and unlawful desecration of Flakewood *Tucker, Jr.* human remains entitles *Plaintiff(s)* to seek criminal charges against *Defendant(*s) and civil suit against Defendant(s) that are liable for damages, fifty million dollars monetary damages, compensatory damages, Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse damages, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse damages; Tort Action for Interference with a Dead Body damages, Desecration damages, treble damages, punitive damages to

prevent hospitals and morticians like Defendant(s) from harming the public and families like Tucker, Plaintiff(s), relief, summary judgment Rule 56, extraordinary relief, any alternative relief this court deems both just and proper to move the court to allow this complaint to proceed for jury trial demand heard on the merits to prevent manifest injustice. travesty of justice. miscarriage of justice to achieve justice.

Plaintiff can **state a claim for** NJ Consumer Fraud Act; theft, Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, unlawful taking and possession of Flakewood Tucker human remains without authorization against Defendant(s) Carl Miller Funeral Home, Levi Coombs, Pamela Dabney and Alexis Coombs violated NJ Rule 13:36-5.17 Removal of Human Remains; Authorization that states:

a) No person shall remove human remains from any residence or institution without first securing authorization consenting to the removal from the legal next of kin, consistent with N.J.S.A. 45:27-22, or a person legally entitled to grant said authorization.
b) All removals of human remains shall be made pursuant to the direction of a registered mortuary.
c) A registered mortuary shall ensure that all persons providing removal services utilize universal precautions as set forth in N.J.A.C. 13:36-6.4 and comply with all applicable Board rules.

*Plaintiff can **state a claim** for NJ Consumer Fraud; Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body unlawful Desecration of Flakewood Tucker, Jr. human remains § 2C:22-1(a)(2) against Defendant(s) Carl Miller Funeral Home, Levi Coombs, Pamela Dabney and Alexis Coombs for performing embalming without authorization from Plaintiff(s) required under New Jersey Laws 13:36-8.8 AUTHORIZATION TO EMBALM HUMAN REMAINS*
No licensed practitioner of mortuary science shall take possession of or embalm human remains without first being directed and fully authorized to do by those whom, in accordance with N.J.S.A. 45:27-22, are charged with the duties of interment.

Plaintiff(s) have met their burden of proof to prove the Defendant(s) Carl Miller Funeral, Levi Coombs, mortician, Pamela Dabney and Alexis Coombs violations of state of New Jersey laws shows Defendant(s) are liable for $50,000,000.00 million dollars monetary damages as the proximate cause for statement of a claim for: negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; *Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful* taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; , 4.43,Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT shows Defendant(s) are the proximate cause of deceit and omission of facts that cause Plaintiff to suffer intentional infliction of emotional distress based on mishandling of corpse, negligent infliction of emotional distress based on mishandling of corpse; emotional turmoil, insult, outrage, overwhelmed and post-traumatic stress disorder (PTSD) death of beloved cherished father Flakewood Tucker, Jr , fear of not being able to see or bury father, hopelessness, helplessness, mental anguish, devastated and destroyed the life of Plaintiff(s) that has adversely affected Plaintiff's physical and mental health and professional career as a allopathic and podiatric physician by the Defendant(s) that had a duty of care, breached that duty required to do;

16

Plaintiff filed a police report in Marlton, NJ

Plaintiff(s) have been residents of Marlton for 45+ years

Plaintiff(s) initially went to Evesham Township police department to file a police report and to press charges against the Defendant(s) of Carl Miller Funeral Home Director and staff as well as Virtua Health, Defendant(s). Everyone in the police department came to hear what I had to say and offer their condolences. The Chief of Police stated that the police report would be filed but they had no jurisdiction to press charges because the incident occurred in Camden County. He told Plaintiff(s) to go to the Camden police station after Plaintiff(s) received the Evesham Township police report, give a copy to the Camden police department, file Plaintiff new police report and press charges against Defendant(s) Carl Miller Medical Director and staff as well as Defendant(s) Virtua Health.

Plaintiff filed a police report in Camden, NJ.

When Plaintiff's arrived at the Camden Police station window and stated we wanted to file a police report and file criminal charges against the Defendant(s) staff of Carl Miller Funeral Home for illegal unlawful taking or possession of human remains; theft of Flakewood Tucker, Jr., body without any oral, verbal or financial agreement and they did not even notify us that they had retrieved Flakewood Tucker, Jr. body. Defendant(s) Carl Miller Funeral Home and Defendant(s) Virtua Hospital Our Lady of Lourdes left us to believe Flakewood Tucker, Jr. body was stollen or destroyed by cremation and we would never see him again to say good-bye nor have a proper funeral or burial service for our family.

The Police Intake Officers and other staff came over to listen to our statement and stated they were not surprised we were not the only people that had this same experience with Carl Miller Funeral Home body snatching illegal misconduct; unlawful taking or possession of human remains, abuse of corpse, Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body. They all offered their condolences. They informed us that 2 detectives were going to go interview the Defendant(s) Carl Miller Funeral Director and Staff and asked us to wait for their return, which took 2-3 hours.

The Intake Officers informed us to go upstairs to meet with the detectives. When Plaintiff(s) arrived upstairs to inform them we were here to meet with 2 detectives.

One Police officer came to the window and stated he interviewed Carl Miller Funeral Director Levi Coombs, Defendant(s) He was appalled that we want to file a police report or press charges against any staff member of Carl Miller Funeral Home, Defendant(s). He said Carl Miller Funeral Home and Levi Coombs, Defendant(s) were pillar of the Camden Community. He said he interviewed the Funeral Director Levi Coombs, Defendant(s) that stated he had oral permission to pick up the body and did not need anything from the family in writing. He said he was not going to file the police report nor press charges against anyone in the Defendant(s) Carl Miller Funeral Home organization. If we did not like the results we could file a complaint against Defendant(s) Carl Miller Funeral Home at the Superior Court, Camden, NJ. He said this matter was closed at the Camden Police Department. Plaintiff(s) demanded the police report be filed and Plaintiff(s) be given a copy to show we filed a written statement. Plaintiff(s) went back downstairs and informed the intake officers and they gave us the information to show we made a written statement.

Plaintiff's buried our beloved Flakewood Tucker, Jr. at Washington Crossing National Cemetery

17

located at 830 Highland Rd, Newtown, PA 18940. Flakewood Tucker, Jr. was pillar to his the United States of America his country that he loved and served as a veteran; he was a pillar to his community, a mentor and hero to all that knew him.

Lord help us!
Writing this is reliving this tragedy all over takes the life and breath out of me; it is so depressing, painful, breaks my entire being, heart, mind and spirit…

## II. STATEMENT OF CLAIM AND FACTS

Plaintiff(s) are entitled to civil sue for statement of a claim against Defendant(s) for negligence, breach of duty of care. intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains; , 4.43,Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT.
Plaintiff(s) can show "No" preneed funeral agreement was offered, made orally or in writing, nor entered into between Defendant(s) Carl Miller Funeral Home, Levi Coombs, Pamela Dabney nor Alexis Coombs.

Plaintiff states claim against Virtua Health Inc. and John Doe Defendant(s) and Carl Miller Funeral Homes and Levy Coombs Defendant(s) regarding the missing Corpse of Flakewood Tucker, Jr. from Virtua Health Hospital Our Lady of Lourdes 1600 Haddon Avenue Camden under N.J.A.C.8:43H (Hospital Licensing Standards) that Defendant(s) had a duty of care to the Plaintiff's. Virtua Heath, Inc., Defendant(s) breached duty of care, in fact was the proximate cause of harm releasing Mr. Flakewood Tucker's body without legal authorization from Mrs. Anita Tucker, wife nor Dr. Karen Tucker, daughter to release Mr. Flakewood Tucker's body for pick up by Defendant(s) Carl Miller funeral home without following protocols explained by Virtua Health, Inc., Defendant(s) that was required to do.

Virtua Health Inc., Defendant(s) did not engage in any channel of communication with the Plaintiff's, Virtua Health Inc., Defendant(s) did not know the date, time, who, when, or where the body of Mr. Tucker was located on Monday, February 28, 2022;  Virtua Health, Inc., Defendant(s) did not review whether a signed preneed funeral contract agreement existed prior to releasing Mr. Tucker's body that shows Virtua Health Inc., Defendant(s) was the proximate cause harm of missing body that  occurred on February 24 – 28, 2022; for 4 days, embalmed body by Carl Miller Funeral Homes, Levy Coombs, funeral director that occurred without verbal or written preneed contract agreement.

We are the Plaintiff's that suffer from emotional distress, anger, hopelessness, feelings of being overwhelmed and worthless as a license state of New Jersey Podiatric Physician and a recent allopathic medical school graduate, daughter, son, mother, and wife could not protect father and husband from harm, danger or negligence occurring whilst a living patient or deceased person hospitalized at Virtua Health, Inc., Defendant(s) hospital has caused us to suffer intentional infliction of emotional distress, outrage, overwhelmed and post-traumatic stress disorder (PTSD).

Plaintiff(s) filed a complaint on Thursday, February 17, 2022 with  Virtua Health, Inc., Defendant(s) Tracey Cannon, patient relations as directed by Virtua Health, Inc., Defendant(s) Mr. Nettles, CEO because

18

Plaintiff did not believe father was safe to be left alone in his hospital room and not transferred to ICU due to incidents that occurred on February 15-17, 2022 turned out to be factual statement to the detriment of his unfortunate untimely death. Dr. Tucker was told she had to leave the hospital and was escorted out by security. She was informed that she would have to contact Virtua Health. Inc.. Defendant(s) Mr. Nettles, CEO to get permission for extended visit hours and that the nursing staff did not have to agree with Virtua Health, Inc., Defendant(s) Dennis Pulliam, CEO, President, Owner decision. Plaintiff(s) went to the Virtua Health Inc., headquarters located at 303 Lippincott Dr., Marlton, NJ 08053 to speak with Virtua Health, Inc., Defendant(s) Mr. Denise Pullin, CEO to discuss the lack of care and safety concerns Plaintiff(s) feared for Flakewood Tucker, Jr., life.  Plaintiff(s) was directed to meet with Virtua Health, Inc., Defendant(s) Mr. Nettles, CEO that authorized Tracey Cannon to address my concerns to extend visitation:
Tracey Cannon, patient relations
(856) 886-6130
TCannon1@virtua.org

### Why was Flakewood Tucker, Jr. hospitalized at Defendant(s) Virtua Health, Inc., Hospital Our Lady of Lourdes?

Flakewood Tucker was seen by Dr. Malek, hepatologist on Monday, February 14, 2022.
Plaintiff(s) called Dr. Malek to inform him that Flakewood Tucker, Jr., had vomited a small amount blood and we were taking him to the emergency room – he required an emergency endoscope.

Plaintiff(s) informed him that she was going to take him to Cooper Hospital Gastroenterology or Jefferson Hospital located in Cherryhill.

Virtua Health, Inc., Defendant(s) Dr. Malek, told Plaintiff(s) Karen Tucker to bring Flakewood Tucker to Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital to be directly admitted in the emergency room under his service because he was on-call and inhouse providing patient care visits, the endoscope would be performed immediately at their facility gastrologist where he and his hepatology group could best evaluate and treat symptoms of acute liver disease, NASH, portal hypertension and acute renal failure.

Plaintiff(s) arrived with Flakewood Tucker, Jr., walking and talking to enter Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital Camden Emergency Department around 10:30 am. The intake nurse and emergency room physician was informed that he was vomiting blood, his voice was becoming shallow, he was having difficulty breathing, stomach was hurting and he was fatigued. Plaintiff(s) informed Virtua Health, Inc., Defendant(s) Our Lady of Lourdes hospital emergency room attending and physician assistant that Virtua Health, Inc., Defendant(s) Dr. Malek said he wrote orders for an emergency endoscope that did not happen on February 15 -17, 2022 despite Plaintiff(s) demands for treatment and surgical intervention.

Flakewood Tucker, Jr was sent for abdominal ultrasound and CT scan but did not perform an endoscope.

Our family will be forever scarred for life trusting Virtua Health, Inc., Defendant(s) Dr. Malek that he or his colleagues wrote orders for an emergency endoscope that could have saved Plaintiff's husband and father, Flakewood Tucker, Jr. life from such an in-patient travesty of drowning on his own blood.

We are a family of healthcare professionals, we understand life and death outcomes; how medical care should be provided and that no outcome is guaranteed to cure symptoms or save lives. Plaintiffs have experienced health care at its very worst by Virtua Health Inc., Defendant(s) that is unacceptable,

19

unconscionable, unfathomable and unforgivable that requires change, investigation by NJ Department of Health, Healthcare Facilities Evaluations and Licensing, NJ Adult Protective Services and the Joint Commission of Hospital Accreditation to help Virtua Inc., Defendant(s) prevent patients and their families and friends from suffering and irreparable harm like the Tucker family. Plaintiff's

Mrs. Anita Tucker and Flakewood Alan Tucker, III accompanied Mr. Flakewood Tucker, Jr. to his room on the third-floor room. Flakewood Tucker, Jr., was conscious awake and alert until he started vomiting large volumes of blood on February 15, 2022 around 8:30 pm. They screamed for the nurses, residents and attending physicians to come help him. Security came to escort them out of the building and Plaintiff(s) had no channels of communications from Defendant(s) about what was happening to our family member. Flakewood Tucker was transferred to the fifth floor.

Plaintiff(s) called the nursing station and was told he was conscious and stable. Plaintiff(s) called his cell phone and did not get an answer. Plaintiff(s) called to tell the nursing station we were on the way and they said we would not be allowed into the building.

Flakewood Alan Tucker, III arrived to the hospital on or about 7:00-7:30 am to find his father hanging over the bed trying to save his own life whilst gagging on his own blood unconscious and unresponsive. Alan was screaming for the medical staff that arrived to resuscitate him. Plaintiff(s) was on the phone with the nursing station on or about 7:30 am and was informed by a nurse that she would look in his room because she could not find his nurse. She returned to the phone stating he was sleeping comfortable and stable turned out to be a false statement because she would have seen his son Flakewood Alan Tucker, III was present and the medical team was trying to resuscitate him to save his life.

**Statement by Flakewood Alan Tucker, III**

On the morning of February 17th, 2022, in room 565 of my father's hospital room, (Mr. Flakewood Tucker Jr).

I (Flakewood Alan Tucker III) arrived between 07:00 – 07:30 am; where I saw my father's head slumped over to his right side of the bed, with his right arm under his head. I also notice 4-5 inches of blood on the mattress, and sheets, with a pool of blood around his pillow, and blood dripping from the side of his mouth on to the floor displaying an outer ring about a foot of dry wet blood, and an inner ring of six inches of dark red blood with clots. I immediately tried to reposition him but couldn't. I went to the door and yelled out to the nurse I saw in the hallway," I need help", the nurse responded, "he's not my patient"" I said it does not matter, I need help".

I return to my father, the nurse came into the room tried to reposition my father with a pillow behind his head, I said" what are you doing he's vomiting", she then decided to go get another nurse. Another nurse came into the room, and that nurse informed the charge nurse of what's going on, upon entering the room, and noticing my father's demise, she then implemented the Rapid Response Team.

The primary nurse ( Nii Choi, RN ). did not reenter the room until the Rapid Response Team arrived (within 10-15 minutes). I asked nurse Nii Choi, RN why wasn't the Rapid Response Team called since he is on the telemetry floor nurse or resident should have been alarmed that he was in life threatening danger. Alan Tucker questioned what time did the nurse last see my father? She responded in front of the Rapid Respond Team, ( 11 medical staff), I just left out the room, I said " so you left him like this in a pool of

20

blood" she then she said no he was transferred to my floor. I was asked to step out of the room, this is when I notice nurse Nii Choi going into the chart, I said" don't try to back chart , back track charting will leave a footprint and it is illegal."

Currently the staff begin to pay more attention to me and asking me questions about my status, like how you know medical terminology. I informed them I am a Registered Diagnostic Ultrasound Technician.

Plaintiff(s) Dr. Karen Tucker arrived and was informed by the chief female resident in charge of rapid response team stated that he was stable, breathing on his own but as far as they could tell he had no mentation for hours and they left the room. His roommate informed us that he had been pushing the button for hours from around 3:00 am until 7:00 am calling out to the nursing staff to come help him and then he said he did not hear him anymore.

Virtua Health, Inc., Defendant(s) Dr. Tusharsindh Chauhan, gastroenterologist came and Plaintiff(s) Dr. Tucker asked why the orders to perform the endoscope was not performed as stated would occur as an emergency procedure on February 15 -16, 2022 that did not occur. Dr. Chauhan stated that there were no written orders charted in the medical record for an endoscope on February 15-17, 2022. Plaintiff(s) Dr. Tucker had to request a CT scan for evaluation of mentation that was completed after endoscope because the attending physician said no one informed him of his status. It was unbelievable!

The Psychology and Surgical residents said that they were not called to see Flakewood Tucker, Jr. upon their arrival they found him unresponsive with no mentation, they resuscitated him and left his room; They had informed Plaintiff(s) that Virtua Health, Inc., Defendant(s) were ending their contracts had no meaning but was taken as a colleague warning. I wanted so desperately to transfer my father out of Defendant(s) facility but he was in critical condition.

Virtua Health, Inc., Defendant(s) Dr. Malek's associate Dr. Galan came to the hospital room door way, they would not enter the room; Plaintiff(s) begged until Dr. Chauhan agreed to perform the endoscope that he stated should have been performed already on February 15, 2022 and did not occur on February 17, 2022 shows the delayed care was the proximate cause of hemorrhagic shock, organ failure, kidney failure and death.

Virtua Health Inc., Defendant(s) Dr. Chauhan said he would take him to surgery to perform the endoscope on February 17, 2022 72 days after he was admitted for vomiting blood that continued for 3 days. After the surgery Dr. Chauhan said he remained unresponsive with no mentation but breathing on his own and he repaired the esophageal varices. Dr. Chauhan said that he had a large amount of blood in his stomach and intestine from bleeding for days caused loss of consciousness that was not observed by Virtua Health, Inc., Defendant(s) nursing staff, physician assistants, residents or attending physicians.

Plaintiff(s) Dr. Tucker spoke with ICU nurse practitioner that declined to move Flakewood Tucker, Jr to ICU because he was not a candidate for intubation. Flakewood Tucker, Jr coded, was resuscitated and transferred to the ICU a few hours later and never required intubation.

Our father never regained full consciousness, he could not speak, suffered traumatically at the Virtua Health, Inc., Defendant(s) Our Lady of Lourdes hospital third floor, fifth floor and died in the ICU on February 22, 2022.

21

Plaintiffs can show the Virtua Heath Inc, Defendant(s) are separately and jointly liable for monetary damages in the amount of fifty million dollars monetary damages, damages, compensatory damages, treble damages, intentional infliction of emotional distress based on the mishandling of corpse, negligent infliction of emotional distress based on the mishandling of corpse and mental anguish damages. economic and earning capacity damages; incidental damages, consequential damages, punitive damages and permanent injunction to punish and expose the atrocities that happened to a colleagues family that goes overlooked when less knowledgeable families make complaints of negligence that can correct misaligned protocols and communication to prevent irreparable harm to patients and their families; relief, summary judgment Rule 56, extraordinary relief, and any alternative damages the Courts deem both just and proper to allow this complaint to proceed for jury trial heard on the merits for any reason to  prevent manifest injustice, prejudice injustice, travesty of justice, and miscarriage of justice to achieve justice.

## III.  STATEMENT OF CLAIM AND FACTS
**Defendant(s) Carl Miller Funeral Home, Levi Coombs, mortician, Pamela Dabney, President, and Alexis Coombs**

**When did this occur?**
Date:  February 25 – March 1, 2022

**Where did this incident happen?**
Virtua Health, Inc., Defendant(s) Our Lady of Lourdes hospital 1600 Haddon Avenue Camden, NJ;

**What happen?**
Plaintiff(s) Dr. Tucker received a call on Monday, February 28, 2022 from Casandra from Mays Funeral Homes stating they could not find or retrieve Flakewood Tucker, Jr., body from Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital, Camden, NJ nor could they locate his death certificate.

*Plaintiff(s)* are Mrs. Anita Tucker, wife, and Dr. Karen Tucker, MD, DPM, MBA daughter family members of patient Flakewood Tucker, Jr., are "Person" means any person as defined in N.J.S.A. 56:8-1 that received a call on Monday, February 28, 2022 informing us that Mays Funeral Home could not find Mr. Tucker's body on February 25-28, 2022. Dr. Tucker spoke with the assistant of Tracey Collin, patient advocate at Virtua Health informing her and Mr. Nettles that my father's body was missing. She contacted security and was told they did not know who picked him up or when he was picked up but he wasn't in the Virtua Hospital building or outside morgue freezer.

**We were so distraught!**
Flakewood Tucker, Jr., died at 6:20 am he was officially pronounced dead on February 22, 2022 in the ICU of Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital, Camden, NJ.

Mrs. Anita Tucker and Dr. Karen Tucker were with Mr. Tucker when he died. We asked what the hospital protocols were regarding what would happen with his body. Plaintiff(s) were informed by Virtua Health, Inc., Defendant(s) that we had five days to claim Flakewood Tucker, Jr., body by contacting and contracting with a Funeral Home to perform funeral. embalming. burial or cremation services

Once we decided who we wanted to contract and pay to perform funeral and burial services that facility would make arrangements to retrieve our loved one from the Virtua Health, Inc., Defendant(s) our Lady of Lourdes hospital morgue, the Virtua Health, Inc., Defendant(s)  emergency department physicians and

22

hospital staff would contact us regarding death certificate and release of medical records; hospital morgue staff, pathologist and mortician would notify us that the remains were retrieved, we would go see the body prior to embalming to ensure us Flakewood Tucker, Jr., was the correct person and could be fixed to look as much as possible like himself in death as in life.

Plaintiff(s) were deceived by Virtua Health, Inc., Defendant(s) our Lady of Lourdes Hospital. None of Virtua Health, Inc., Defendant(s) Our Lady of Lourdes Hospital standard of care protocols were followed at Virtua Health, Inc., Defendant(s) Hospital Our Lady of Lourdes, Camden, NJ as required to do.

"NO" Virtua hospital physicians or staff called, no hospital morgue staff or pathologist physician nor the security guard team called to inform us of the date and time Flakewood Tucker, Jr. remains were retrieved by a named person or funeral home as required to do.
Plaintiff(s) were informed by Virtua Health, Inc., Defendant(s) Tracey Collins, patient relations or Mr. Nettles, CEO assistant that the hospital morgue nor Virtua Hospital security records had "NO" date, no time and no name of any persons or funeral home that picked up Flakewood Tucker, Jr., body as of Monday, February 28, 2022 at 3:00 pm and Plaintiff(s) Dr. Tucker would have to find his body on own.

Plaintiff(s) Dr. Tucker was informed by Virtua Health, Inc., Defendant(s) that Mr. Tucker was no longer in the Virtua Hospital records and his, My Chart electronic record was discontinued/removed no one in the Virtua Health, Inc., Defendant(s)Our Lady of Lourdes Hospital could offer any further assistance regarding the location of Flakewood Tucker, Jr. missing body. "Good Luck!"
Anxiety and Panic Attack!

Dr. Tucker called Bradley, Hutton and Carl Miller Funeral Homes and discovered Carl Miller funeral home picked him up without any verbal or written preneed contract agreement or fees paid and never notified the Tucker family as of Monday, February 28, 2022 at 5:00 pm.

Dr. Tucker was told that Carl Miller funeral home picked up the body by mistake by Alexis Coombs and Pamela Dabney staff employed at Carl Miller. Pamela Dabney said, " we did not embalm him, you can come get him and we are not charging you any fees.
No apology – hung up phone!

Crushed and Breathless!

Would we be able to see Dad, was he decomposed, were we going to be forced to cremate his remains against our wishes without an open coffin for family and friends to view his body and say good bye.

The State of New Jersey has a detailed law that clearly defines who can legally make decisions for the funeral and disposition (burial or cremation) of a deceased person. Funeral homes and cemeteries are required to follow the law for all arrangements that did not occur as required to do.

New Jersey's law (N.J.S.A. 45:27-22 Control of funeral, disposition of remains) specifies who has the right to provide authorization to a funeral home to transfer the deceased from their place of death, make decisions for the deceased's care and disposition, and determine the selection of funeral merchandise.

23

My mother's husband and our father did not deserve the harm that exculpatory material evidence can show Defendant(s) was the proximate cause of intentional infliction of emotional distress based upon the mishandling of a corpse; negligent mishandling of Flakewood Tucker, Jr human remains he received as a living patient or as a desecrated deceased victim at Virtua Health. Inc.. Defendant(s) Our Lady of Lourdes Hospital, Camden, NJ as exculpatory material evidence can show Defendant(s) are liable for fifty million dollars monetary damages as the proximate cause of statement of claims for negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT.

**Who did what?**

Plaintiff(s) Karen Tucker called several funeral homes and discovered Carl Miller funeral home had picked him up. Pamela Dabney and Alexis Coombs said he was picked up by mistake without authorization but they did not embalm him,  we could come pick him up and they were not charging us any fees.

How heartless and insulting!

Plaintiff(s) called Mays Funeral Home and Casandra contacted Defendant(s) Carl Miller Funeral Home to get Flakewood Tucker, Jr., body released to Mays Funeral Home facility. Mays Funeral Home did not receive him until Tuesday, March 1, 2022;  he was embalmed by Defendant(s) Levy Coombs, III, Carl Miller Funeral Home, Mr. Tucker's frontal scalp had a gash in his head that was not present whilst living nor at the time of death (pictures will be presented as exhibits);  he was black-black-black with a joker looking smirk *on his face*.

We the Tucker family are devastated.

Defendant(s) Alexis Coombs and Pamela Dabney knowingly and willfully made false statement and negligent mis-representation that they did not embalm Flakewood Tucker, Jr., and Defendant(s) Levy Coombs, Funeral Director of Carl Miller Funeral Home embalmed Mr. Tucker without authorization, no preened contract agreement, no payments made nor any knowledge of what Flakewood Tucker, Jr looked like as a living human being was absolutely heart breaking shows Defendant(s) Carl Miller Funeral Home, Levy Coombs, Defendant(s) are the proximate cause of statement of claims for negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the *whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains*; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT and embalming Flakewood Tucker's body in violation of the board of mortuary services and NJ Consumer Affairs fraud act laws, rules and regulations are liable for monetary damages in the amount of fifty million dollars, damages, compensatory damages, treble damages, emotional distress and mental anguish damages, incidental damages,

24

consequential damages, punitive damages and permanent injunction to punish and expose the atrocities that happened to our family and others that has gone overlooked or excused to due to the pandemic must not go unpunished; relief, Summary Judgement Rule 56; extraordinary relief and any other alternative relief this court deems both just and proper to all this complaint to proceed for jury trial demand heard on the merits for any reason to prevent manifest injustice, prejudice injustice, travesty of justice and miscarriage of justice to achieve justice.

Defendant(s) Carl Miller's  funeral director Levy Coombs nor his staff made "NO" effort to contact the Tucker family for four days because they had actual knowledge and "knew" they did not have any authorization or preneed contact agreement to make any decisions regarding the deceased body of Flakewood Tucker, Jr.

Defendant(s) Carl Miller's staff knew exactly what they were doing because they knowingly, willfully and intentionally with wanton disregard for the Tucker family, Plaintiff(s) had superior knowledge as a licensed NJ Mortician about NJ Consumer Affair fraud laws and NJ Mortuary laws, rules and regulations submitted documentation to receive Mr. Tucker's death certificates that could allow them to submit claims for Life Insurance Claim benefit payments unauthorized  by Plaintiff(s) shows we have met our burden of proof to prove Defendant(s) Carl Miller funeral home under the license of Levy Coombs was not a mistake but theft of a corpse, deception, false pretense and more likely than not has occurred  before and they got away with violating laws of the New Jersey Board of Mortuary Science Rules and Regulation: laws of New Jersey Consumer Affairs Fraud Act, and the Virtua Health Company is Negligent, violated  NJ Department of Health, Healthcare Facilities Evaluations and Licensing, and the Joint Commission of Hospital Accreditation laws, rules and regulations.

**How did this occur?**
The family of Flakewood Tucker, Jr., made funeral pricing inquiries with Cotton, Woody, Bradley, Hutton, Carl Miller and Mays Funeral Homes on Thursday, February 24, 2022. The funeral homes were informed that we would notify them on Friday, February 25, 2022 by phone if we were not going to use their services after our meeting in Philadelphia, PA with Joe Kauffman, VA National Services Offices regarding burial services location and cost for our deceased veteran.

Mrs. Anita Tucker nor Dr. Karen Tucker did not ever make any verbal or written preneed funeral arrangements commitments or agreements with Levy Combs, III, Funeral Director of Carl Miller Funeral Home 831 Carl Miller Blvd., Camden, NJ 08104 (856) 365-2966.

On Friday, February 25, 2022 Mrs. Anita and Dr. Karen Tucker met with Joe Kauffman, VA National Services Office 5000 Wissahickon Avenue, Philadelphia, PA 19144 (215) 381-3065; DAV.VBAPHI@VA.GOV

We discussed the location of the VA Federal Cemetery located at Washington Crossing National Cemetery 830 Highland RD, Newtown, PA cost of travel from Virtua Hospital in Camden, NJ to Newark, NJ to Newtown, PA and back to Newark, NJ was not in our best interest. We decided Mays Funeral Home in Willingboro, NJ offered the best facility. service and location for our North Jersey and New York family members to pay their final respects.

Plaintiff(s) called Defendant(s) Carl Miller funeral home on February 25, 2022 at 1:00 pm after we concluded our meeting with Joe Kauffman at the Veteran Affairs. Dr. Tucker spoke with Alexis Coombs and

25

Pamela Dabney. Plaintiff(s) informed them that we would not be using Carl Miller funeral home services and they said no problem. Neither one of them mentioned that they had picked up Flakewood Tucker, Jr. my father's body.

We called Mays Funeral Home to inform them on Friday, February 25, 2022 that we were on our way to their location at 45 Pine Street Willingboro, NJ  to enter into a contract to pay for funeral services after returning from a meeting with Mr. Kauffman at the Veterans Affairs office to confirm the burial plans prior to contracting with any funeral home.

Mr. Darien Davis, Funeral Director stated that Mays Funeral Home would pick up my dad's body on February 25, 2022 and call us to come view the body and bring a picture of him to be reviewed prior to embalming Flakewood Tucker, Jr's body.

On Monday, February 28, 2022 Plaintiff(s) found Flakewood Tucker, Jr missing body at Defendant(s) Carl Miller funeral home.  Plaintiff(s) called Mays Funeral Home and Casandra contacted Defendant(s) Carl Miller to get the body released to their facility and did not receive him until Tuesday, March 1, 2022;  he was embalmed, black-black-black with a joker looking smirk on his face by Defendant(s) Carl Miller Funeral Home Mortician, Levi Coomb, III.

Plaintiff(s) were outraged, horrified and mortified!

**What was the Outcome?**
Mrs. Anita Tucker, Dr. Karen Tucker, Flakewood Alan Tucker, III, Flakewood Alan Tucker, IV and 95 years-old Hilda L. Baggs suffered harm showing Defendant(s) are liable for damages as the proximate cause of negligent behavior like statement of a claim for negligence, , NJ Consumer Fraud Act, Deceit; intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; loss of body, deceit, omission of facts, false pretense, false statements, misrepresentations to conceal Flakewood Tucker, Jr., human remains; interference with a dead body; unlawfully taking or possessing Flakewood Tucker, Jr. human remains; unlawfully desecrate, damage or destroy Flakewood Tucker, Jr., human remains; theft of body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr.  missing corpse;  Mis delivery of human remains Flakewood Tucker, Jr. human remains—that is, if particular conduct or lack of conduct that doesn't have an intent to injure others like Anita Tucker, Plaintiff, Karen Tucker, Plaintiff, but creates a foreseeable risk of injury to others Anita Tucker, Plaintiff, Karen Tucker, Plaintiff , Defendant(s) are required (Defendant(s) have a duty) to refrain from acting in that way.

Mrs. Tucker went to the Marlton, NJ police department because she has been a resident for 50 years to file a police report regarding her deceased husbands missing body. Everyone was horrified and mortified. Mrs. Tucker was advised to file a police report in Camden, NJ, the city where the incident occurred.

Mrs. Tucker and Dr. Tucker arrived at 2:15 pm to the Camden County Police station front window and spoke with representative Bishop Ben and a black female officer. We stated that our family members body was missing from Our Lady of Lourdes. The police officers were not surprised Carl Miller Funeral Home was involved.

26

We were in shock and Awe!

They took our statements, confirmed that the body was not left at the hospital more than 5 days from the date of February 22. 2022 death. They requested a detective go visit Levy Coombs, funeral director, Alexis Coombs and Pamela Dabney to get their side of the story.

Levy Coombs, Funeral Director of Carl Miller informed the detectives that he did not need a contract, he had verbal right to pick up the body and embalm Flakewood Tucker, Jr., turned out to be a false statement, negligent misrepresentation and fraudulent misrepresentation he intended the detective to rely upon to the detrimental reliance of willfully dismissing our request to file a police report and stated we needed to go to court and file a complaint at the NJ Superior Court, Camden;  very dismissive, without knowing his statements could be in violation of NJ Board of Mortuary Science and NJ Consumer Affairs laws, NJ Consumer Fraud Act, rules and regulations.
Sgt. Lewis expressed his comments that Carl Miller Funeral Home, Levy Coombs was a pillar in the Camden Community. He said he did not want to file a police report we could go file a complaint in NJ Superior Court of Camden.

We demanded SGT. Lewis file the police report. We were given a Case Number:  2203020304.
Camden County Police Department
1 Police Plaza 800 Federal Street
Camden, NJ 08103
(856) 757-7400
How would any of you feel, what would you expect for a final outcome and how can you implement new protocols to bring about change to help prevent these types of atrocities?

We have contacted and informed Congressmen Donald Payne, Jr. of these atrocities that have occurred to a US Citizens, US Veteran, and sixth generation natives of the state of New Jersey.

Flakewood Tucker, Jr did not deserve this type of negligent Virtua heath care in life;  abuse and mistreatment in death, he had a gash on the side of his head. We have pictures of him when he died showing no gash or wound on his head was not present shows corpse abuse.

Flakewood Tucker, Jr., was a loving always present husband, father, grandfather, son-in-law, brother, uncle, cousin, friend, hope to the hopeless; a good and kind man that would help anyone in need of anything.

He was our "Pillar" that deserved better!

## IV. STATEMENT OF CLAIMS AND FACTS

### NEGLIGENCE
I am the Plaintiff(s) that **states a claim for negligence** against the Virtua Health, Inc., Defendant(s) showing that delayed medical and surgical health care was the proximate cause death and losing our beloved Flakewood Tucker, Jr., husband, father and son is grief enough.  Plaintiff(s) did not deserve or need our sadness compounded by Defendant(s) Levi Coombs, III, Pamela Dabney, Alexis Coombs and Carl Miller Funeral home or mortuary mistakes. Plaintiff(s) put our trust in medical physician professionals a

27

mortician professionals for interment services that our loved ones will be handled with care and dignity that was not performed as required to do.

Plaintiff(s) can show they are entitled to the right civil suit against Defendant(s) for negligence, intent, or fraud, showing Defendant(s) betrayed Plaintiff(s) trust.

Plaintiff(s) can show entitlement to civil suit Defendant(s) for mortuary neglect: Traditional Negligence Mortuary neglect can take many forms, but in most cases the harm was accidental. Misplacing or mixing up bodies or failing to preserve a body properly can happen due to carelessness or even recklessness, and the mortuary or funeral home can be liable under traditional negligence law.

## V. STATEMENT OF CLAIM AND FACTS

Plaintiff(s) can show they have met their burden of proof to prove a statement of claim for negligence against the Defendant(s) showing:

## STATE OF NEW JERSEY HOSPITAL BREACH OF DUTY OF CARE

Duty: Virtua Health, Inc., Dennis Pulliam and Jon Does(s) Defendant(s) owes Plaintiff(s) Virtua provides a comprehensive continuum of health care to the residents of southern New Jersey. As the largest not-for-profit health system in the region, Virtua's mission is to help you be well, get well and stay well. N.J. Admin. Code § 8:43G-4.1; Section 8:43G-4.1 - Patient rights

**(a)** Every New Jersey hospital patient shall have the following rights, none of which shall be abridged by the hospital or any of its staff. The hospital administrator shall be responsible for developing and implementing policies to protect patient rights and to respond to questions and grievances pertaining to patient rights. These rights shall include at least the following:

**1.** To receive the care and health services that the hospital is required to provide under *N.J.S.A. 26:1-1* et seq. and rules adopted by the Department to implement this law;

**2.** To treatment and medical services without discrimination based on race, age, religion, national origin, sex, sexual preferences, handicap, diagnosis, ability to pay, or source of payment;

**3.** To retain and exercise to the fullest extent possible all the constitutional, civil, and legal rights to which the patient is entitled by law;

**4.** To be informed of the names and functions of all physicians and other health care professionals who are providing direct care to the patient. These people shall identify themselves by introduction or by wearing a name tag;

**5.** To receive, as soon as possible, the services of a translator or interpreter to facilitate communication between the patient and the hospital's health care personnel;

**6.** To receive from the patient's physician(s) or clinical practitioner(s) -- in terms that the patient understands -- an explanation of his or her complete medical condition, recommended treatment, risk(s) of the treatment, expected results and reasonable medical alternatives. If this information would be detrimental to the patient's health, or if the patient is not capable of understanding the information, the explanation shall be provided to his or her next of kin or guardian and documented in the patient's medical record;

**7.** To give informed, written consent prior to the start of specified nonemergency procedures or treatments only after a physician or clinical practitioner has explained -- in terms that the patient understands -- specific details about the recommended procedure or treatment, the risks involved, the possible duration of incapacitation, and any reasonable medical alternatives for care and treatment. The procedures requiring informed, written consent shall be specified in the hospital's policies and procedures. If the patient is incapable of giving informed, written consent, consent shall be sought from the patient's next of kin or

28

guardian or through an advance directive, to the extent authorized by law. If the patient does not given written consent, a physician or clinical practitioner shall enter an explanation in the patients medical record;

**8.** To refuse medication and treatment to the extent permitted by law and to be informed of the medical consequences of this act;

**9.** To be included in experimental research only when he or she gives informed, written consent to such participation, or when a guardian provides such consent for an incompetent patient in accordance with law and regulation. The patient may refuse to participate in experimental research, including the investigations of new drugs and medical devices;

**10.** To be informed if the hospital has authorized other health care and educational institutions to participate in the patient's treatment. The patient also shall have a right to know the identity and function of these institutions, and may refuse to allow their participation in the patient's treatment;

**11.** To be informed of the hospital's policies and procedures regarding life-saving methods and the use or withdrawal of life-support mechanisms. Such policies and procedures shall be made available promptly in written format to the patient, his or her family or guardian, and to the public, upon request;

**12.** To be informed by the attending physician and other providers of health care services about any continuing health care requirements after the patient's discharge from the hospital. The patient shall also have the right to receive assistance from the physician and appropriate hospital staff in arranging for required follow-up care after discharge;

**13.** To receive sufficient time before discharge to have arrangements made for health care needs after hospitalization;

**14.** To be informed by the hospital about any discharge appeal process to which the patient is entitled by law;

**15.** To be transferred to another facility only for one of the following reasons, with the reason recorded in the patient's medical record:

**i.** The transferring hospital is unable to provide the type or level of medical care appropriate for the patient's needs. The hospital shall make an immediate effort to notify the patient's primary care physician and the next of kin, and document that the notifications were received; or

**ii.** The transfer is requested by the patient, or by the patient's next of kin or guardian when the patient is mentally incapacitated or incompetent;

**16.** To receive from a physician an explanation of the reasons for transferring the patient to another facility, information about alternatives to the transfer, verification of acceptance from the receiving facility, and assurance that the movement associated with the transfer will not subject the patient to substantial, unnecessary risk of deterioration of his or her medical condition. This explanation of the transfer shall be given in advance to the patient, and/or to the patient's next of kin or guardian except in a life-threatening situation where immediate transfer is necessary;

**17.** To be treated with courtesy, consideration, and respect for the patient's dignity and individuality;

**18.** To freedom from physical and mental abuse;

**19.** To freedom from restraints, unless they are authorized by a physician for a limited period of time to protect the patient or others from injury;

**20.** To have physical privacy during medical treatment and personal hygiene functions, such as bathing and using the toilet, unless the patient needs assistance for his or her own safety. The patients privacy shall also be respected during other health care procedures and when hospital personnel are discussing the patient;

**21.** To confidential treatment of information about the patient. Information in the patient's records shall not be released to anyone outside the hospital without the patient's approval, unless another health care facility to which the patient was transferred requires the information, or unless the release of the information is required and permitted by law, a third-party payment contract, a medical peer review, or the Department .

29

The hospital may release data about the patient for studies containing aggregated statistics when the patient's identity is masked;

**22.** To receive a copy of the hospital payment rates, regardless of source of payment. Upon request, the patient or responsible party shall be provided with an itemized bill and an explanation of the charges if there are further questions. The patient or responsible party has a right to appeal the charges. The hospital shall provide the patient or responsible party with an explanation of procedures to follow in making such an appeal;

**23.** To be advised in writing of the hospital rules and regulations that apply to the conduct of patients and visitors.

**i.** The partner in a civil union of a patient, and/or the domestic partner of a patient, shall have the same visitation privileges as if the visitor were the patient's spouse.

**ii.** A facility shall not require a patient or the patient's civil union partner or domestic partner to produce proof of that partnership status as a condition of affording visitation privileges unless the facility in similar situations requires married patients or their spouses to produce proof of marital status.

**iii.** Visitation privileges shall not be denied or abridged on the basis of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income.

**iv.** Visitation may be restricted in medically appropriate circumstances or based on the clinical decision of a health care professional charged with the patient's care;

**24.** To have prompt access to the information contained in the patient's medical record, unless a physician prohibits such access as detrimental to the patient's health, and explains the reason in the medical record. In that instance, the patient's next of kin or guardian shall have a right to see the record. This right continues after the patient is discharged from the hospital for as long as the hospital has a copy of the record;

**25.** To obtain a copy of the patient's medical record, at a reasonable fee, within 30 days of a written request to the hospital. If access by the patient is medically contraindicated (as documented by a physician in the patient's medical record), the medical record shall be made available to a legally authorized representative of the patient or the patient's physician;

**26.** To have access to individual storage space in the patient's room for the patient's private use. If the patient is unable to assume responsibility for his or her personal items, there shall be a system in place to safeguard the patient's personal property until the patient or next of kin is able to assume responsibility for these items;

**27.** To be given a summary of these patient rights, as approved by the Department, and any additional policies and procedures established by the hospital involving patient rights and responsibilities. This summary shall also include the name and phone number of the hospital staff member to whom patients can complain about possible patient rights violations. This summary shall be provided in the patient's native language if 10 percent or more of the population in the hospital's service area speak that language. In addition, a summary of these patient rights, as approved by the Department , shall be posted conspicuously in the patient's room and in public places throughout the hospital. Complete copies of this subchapter shall be available at nurse stations and other patient care registration areas in the hospital for review by patients and their families or guardians;

**28.** To present his or her grievances to the hospital staff member designated by the hospital to respond to questions or grievances about patient rights and to receive an answer to those grievances within a reasonable period of time. The hospital is required to provide each patient or guardian with the names, addresses, and telephone numbers of the government agencies to which the patient can complain and ask questions, including the Department's Complaint Hotline at 1-800-792-9770. This information shall also be posted conspicuously in public places throughout the hospital;

30

**29.** To be assisted in obtaining public assistance and the private health care benefits to which the patient may be entitled. This includes being advised that they are indigent or lack the ability to pay and that they may be eligible for coverage, and receiving the information and other assistance needed to qualify and file for benefits or reimbursement:

**30.** To contract directly with a New Jersey licensed registered professional nurse of the patient's choosing for private professional nursing care during his or her hospitalization. A registered professional nurse so contracted shall adhere to hospital policies and procedures in regard to treatment protocols, and policies and procedures so long as these requirements are the same for private duty and regularly employed nurses. The hospital, upon request, shall provide the patient or designee with a list of local non-profit professional nurses association registries that refer nurses for private professional nursing care; and

**31.** To expect and receive appropriate assessment, management and treatment of pain as an integral component of that person's care, in accordance with N.J.A.C. 8:43E-6.

*N.J. Admin. Code § 8:43G-4.1*

Amended by 50 N.J.R. 552(b), effective 1/16/2018

https://casetext.com/regulation/new-jersey-administrative-code/title-8-health/chapter-43g-hospital-licensing-standards/subchapter-4-patient-rights/section-843g-41-patient-rights

- Breach of Duty: Plaintiff can state a claim against Virtua Health, Inc, Denise Pulliam and Jon Doe(s) Defendant(s) known as the hospital breached that duty by failing to exercise reasonable care in handling, preparing, or displaying the remains as the proximate cause of Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains; theft, unlawful taking and possession, abuse of body, desecration and embalming of Flakewood Tucker, Jr., corpse without authorization from Plaintiff(s) Anita Tucker, wife or daughter Karen Tucker.
- Cause: Plaintiff can show Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) known as the hospital breach caused Plaintiff(s) damages of fifty million dollars monetary damages and Defendant(s) breach was the proximate cause of Plaintiff(s) harm negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT.
- Damages: I am the Plaintiff that has met burden of proof to prove Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) are liable for fifty million dollar monetary damages showing Defendant(s) are the proximate cause of negligence, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT.

**MORTUARY HOME BREACH OF DUTY OF CARE**

- Duty: Plaintiff can show the duty Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs, Defendant(s) known as mortuary owes customers and clients a duty of reasonable care in caring for and preparing remains for burial or interment.
- Breach of Duty: Plaintiff can state a claim against Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) known as the mortuary breached that duty by failing to exercise reasonable care in handling, preparing, or displaying the remains as the proximate cause of theft, unlawful taking and possession, desecration and embalming of Flakewood Tucker, Jr., corpse without a contract, written nor oral authorization from Plaintiff(s) Anita Tucker, wife or daughter Karen Tucker.
- Cause: Plaintiff can show Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) known as the mortuary's breach caused Plaintiff(s) damages of fifty million dollars monetary damages and Defendant(s) breach was the proximate cause of Plaintiff(s) harm negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT.
- Damages: I am the Plaintiff that has met burden of proof to prove Defendant(s)Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs are liable for fifty million dollar monetary damages showing Defendant(s) are the proximate cause of negligence, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT.

**Intentional Torts**

I am the Plaintiff that can **state a claim for negligence** against the Virtua Health Inc., Denise Pulliam, Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coombs, III; Pamela Dabney, Alexis Coombs, Jon Doe(s) Defendant(s) for negligence, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT before or during the interment process.

Plaintiff can show any of these can be considered as fraud or an intentional tort, leading to civil liability.

32

Intentional torts are wrongful acts done on purpose. Plaintiff(s) can show The persons like Defendant(s) does not need to actually mean harm, but the other person(s) like Plaintiff(s) Karen Tucker, Anita Tucker and Flakewood Alan Tucker, III ends up hurt anyway, such as delayed care, intentional infliction of emotional distress based upon the mishandling of a corpse: negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of Flakewood Tucker, Jr., corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; such as a in a prank. Or, the person can definitely mean harm, such as domestic violence cases.

I am the Plaintiff that can **state a claim for negligence** against the Virtua Health Inc., Denise Pulliam, Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coombs, III; Pamela Dabney, Alexis Coombs, Jon Doe(s) Defendant(s) showing A "tort" is some kind of wrongful act like delayed care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of Flakewood Tucker, Jr., corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains by these Defendant(s) that causes harm, intentional infliction of emotional distress based upon the mishandling of Flakewood Tucker, Jr corpse; negligent infliction of emotional distress based upon the mishandling of Flakewood Tucker, Jr., corpse to someone else like Plaintiff(s) Karen Tucker, Anita Tucker and Flakewood Alan Tucker, III.

## VI and VII. STATEMENT OF CLAIM AND FACTS
## INTENTIONAL AND NEFGLIGENT INFLICTION OF EMOTIONAL DISTRESS BASED ON MISHANDLING OF CORPSE

Plaintiff(s) can show they are entitled to **state a claim for emotional distress** against the Defendant(s) showing Emotional distress is the same as mental anguish. Plaintiff(s) can show Defendant(s) was the proximate cause of Plaintiff(s) harm, feelings of fright, dismay, consternation and distress from death, missing body and abused body of Flakewood Tucker, Jr. Plaintiff(s) suffered humiliation, mortification great embarrassment and shame that: Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) overlooked professional pleas for timely help that could have prevented death; Defendant(s) breached duty of care responsibility for Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains. Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) showed no remorse for theft, unlawful taking, unlawful desecration, embalming and abuse they caused to Flakewood Tucker, Jr., human remains mortified Plaintiff(s).

I am the Plaintiff that can show she has met burden of proof to prove Defendant(s) are liable for Fifty million dollars monetary damages as the proximate cause of intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with Flakewood Tucker, Jr., Dead Body that shows the distress is more than fleeting; the : Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) conduct caused the of intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; the distress is medically significant causing heart break

33

syndrome, anxiety, bouts of crying, sleeplessness, inability to sleep, insomnia, inability to focus and exacerbation of pain.

I am the Plaintiff(s) that can show Defendant(s) are liable for Damages for emotional distress that can be awarded for mistreatment of our beloved husband, father and son Flakewood Tucker, Jr., corpse

Plaintiff can show in the state of New Jersey there is no requirement for Plaintiff(s) to prove he or she was physically injured.

Plaintiff has met burden of proof to prove Emotional distress may be pursued as a separate and independent claim when the Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) acted intentionally and outrageously.

I am the Plaintiff that can show Intentional infliction of emotional distress occurs when the Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) conduct exceeded all boundaries of conduct tolerated by decent society; was especially calculated to cause, and did cause, Plaintiff(s) mental distress; caused Plaintiff(s) distress of substantial or enduring quality that no reasonable person should be expected to endure.

Plaintiff(s) can show they have met burden of proof to prove Anita Tucker, wife, Karen Tucker, daughter and Flakewood Alan Tucker, III are entitled to state a claim for emotional distress against Virtua Health, Inc., Dennis Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs Defendant(s) because they witnesses the Flakewood Tucker, Jr. unfortunate incident that happened unexpectedly; death, missing body, abused body, mishandled body, unlawful desecration of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains, unlawful taking and possession of corpse, theft of body; intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with Flakewood Tucker, Jr., Dead Body involved Plaintiff(s) close relative.
I am the Plaintiff(s) that has met burden of proof to prove statement of claim for intentional infliction of emotional distress against Defendant(s) shows the intentional mistreatment of Plaintiff(s) loved one's Flakewood Tucker, Jr., human remains could certainly qualify as extreme or outrageous conduct that intentionally or recklessly causes severe emotional distress.

I am the Plaintiff that has met burden of proof to prove entitlement to civil suit against Defendant(s) that can be held liable fifty million dollars monetary damages showing Flakewood Tucker, Jr. Plaintiff(s) loved one was neglected, abused, or exploited by Virtua Health, Inc., Dennis Pulliam, Jon Doe(s) Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home Defendant(s) for statement of a claim for Negligence that is the legal term for liability or responsibility in an unfortunate incident that happened unexpectedly to Flakewood Tucker, Jr whilst alive and in death.

Plaintiff has met her burden of proof to prove liability against ) Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home generally involves satisfying the following criteria:
- **The Carl Miller funeral home Defendant(s) owed Plaintiff(s) a duty of care. T**hey were responsible for treating the deceased in an honest and respectful manner, and they failed to do so.

34

- **Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home breached their duty. Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home** breached their legal obligation to avoid harming Plaintiff(s) loved one Flakewood Tucker, Jr.
- Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home **breach directly resulted in harm.** Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home was responsible for the abuse or mishap, making them legally liable.
- **Plaintiff(s) suffered losses as a result. Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home's** actions injured the deceased physically and/or Plaintiff(s) family emotionally and financially.

## VIII. STATEMENT OF CLAIM AND FACTS MISHANDLING OF HUMAN REMAINS

Plaintiff(s) can show they are entitled to **state a claim against Defendant(s); Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home for Mishandling of Flakewood Tucker, Jr., human remains** that was the proximate cause of the improper storage or transport of Flakewood Tucker, Jr. body can affect its appearance prior to burial, making it impossible for family members to see or recognize their loved ones one last time. Plaintiff(s) can show other incidents of mishandling of Flakewood Tucker, Jr., corpse by Defendant(s) Levi Coombs, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home include dropping the body, failing to identify the body and mutilation of the corpse prior to transportation from Virtua Health, Inc., Defendant(s) Our Lady of Lourdes hospital morgue without authorization from Plaintiff(s).

Defendant(s) Levi Coomb, III, Pamela Dabney, Alexis Coombs, and Carl Miller funeral home was not authorized to embalm Flakewood Tucker, Jr., that shows they did not know what he looked like whilst living; Defendant(s) made embalming errors. Defendant(s) embalming errors lead to mistakes that resulted in disfigurement. Plaintiff can show Defendant(s) deprived Plaintiff(s) of Mays Funeral Home embalming Flakewood Tucker, Jr., with pictures that showed how his face looked that was meant to preserve the body long enough for family members to see Flakewood Tucker, Jr., our loved one as he was during his life, the but Carl Miller Funeral Home, Levi Coombs, III, Defendant(s) embalming process can lead to mistakes.

## IX. STATEMENT OF CLAIMS AND FACTS
## BREACH OF DUTY OF CARE
## DUTY OF FUNERAL DIRECTOR

I am the Plaintiff that can **state a claim for breach of duty of care** against the Defendant(s) showing Levi Coombs, licensed mortician had a duty of care in his care of each subject, the embalmer has a heavy responsibility, for his skill and interest will largely determine the degree of permanent mental trauma to be suffered by all those closely associated with the deceased.

Defendant(s) Levi Coombs breached his duty of care in violation of state of New Jersey Consumer Fraud Act law by committing unlaw theft, taking and possession of Flakewood Tucker, Jr., body, unlawful desecration of human remains and embalming without authorization from Flakewood Tucker, Jr., wife Anita Tucker or daughter, Karen Tucker shows Defendant(s); Plaintiff(s) did not verbally, oraly nor entered Defendant(s) itemized Carl Miller Funeral Home contract agreement that was never offered or agreed; Defendant(s) were never authorized to order Flakewood Tucker, Jr., Death Certificates that blocked Plaintiff(s) agent Mays Funeral Home from ordering the documents Plaintiff(s) required to present to claim life insurance policies, bank accounts, stocks, bonds, and pay checks shows Defendant(s) are liable for fifty

million dollars monetary damages as the proximate cause of harm to Plaintiff(s) for statement of a claim against Defendant(s) for:  Negligence, , 4.43 Consumer Fraud Act NJSA 56:8-184, 3.30E FRAUD — DECEIT; Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse;  Mis delivery of human remains;

**Controlling Your Funeral**

Plaintiff(s) can show Defendant(s) Carl Miller Funeral Home, Levi Coombs, III, NJ Licensed Mortician, Pamela Dabney, President and Alexis Coombs boast about their years of experience on their website had superior knowledge knew about: The State of New Jersey has a detailed law that clearly defines who can legally make decisions for the funeral and disposition (burial or cremation) of a deceased person.

Funeral homes and cemeteries are required to follow the law for all arrangements.

New Jersey's law (N.J.S.A. 45:27-22 Control of funeral, disposition of remains) specifies who has the right to provide authorization to a funeral home to transfer the deceased from their place of death, make decisions for the deceased's care and disposition, and determine the selection of funeral merchandise.

The law explains that if the deceased has not left a will or state approved document appointing a person to control their funeral, burial or cremation or if a United States military form DD 93 is not in force, the right to control follows the order below, unless other directions have been issued by a court order:

- **Plaintiff(s) can show Anita Tucker was Flakewood Tucker, Jr., Legal spouse,**

- **Majority of surviving children over the age of 18 like Plaintiff can show Karen Tucker was Flakewood Tucker, Jr., daughter**

**New Jersey Home Funeral Laws**
New Jersey is one of only a handful of states that restrict home funerals by requiring the involvement of a licensed funeral director in many aspects of final arrangements. Here is an overview of the rules that govern home funerals in New Jersey.

**You Must Use a Funeral Director in New Jersey**
By law, a licensed funeral director must oversee the final disposition of a body in New Jersey. For example, state law requires that "the funeral director in charge of the funeral or disposition of the body" must file the death certificate. (See New Jersey Statutes § 26:6-6 (2018).)

**Who Makes Decisions About Body Disposition and Funeral Arrangements?**
Although a funeral director must carry out disposition arrangements, New Jersey law determines who has the right to make final decisions about a person's body and funeral services. This right and responsibility goes to the following people, in order:
- a person you appoint in your will
- your surviving spouse, civil union partner, or domestic partner
- a majority of your adult children
- your parents

- a majority of your siblings
- your next of kin, or
- any other person acting on your behalf.

(New Jersey Statutes § 45:27-22 (2018).)

Appointing a representative in your will. You can name any adult to oversee your final arrangements; the person does not have to be the executor of your will. If you use your will for this purpose, it is critical that you give a copy of your will to the person you name -- or tell them how to easily find it after your death. Don't lock your will away in a safe deposit box or otherwise restrict your representative's access to it. If you do, your wishes may not be located until it is too late to carry them out.

Note that, if you are in the military, you may name the person who will carry out your final wishes in the Record of Emergency Data provided by the Department of Defense.

Who pays for your funeral arrangements? You can either pay for your plans before you die, or you can set aside money for your survivors to use for this purpose. If you don't do either of these things, and there's not enough money in your estate to pay for funeral goods and services, your survivors must cover the costs.

**Must the Body Be Embalmed?**
Embalming is almost never required. In New Jersey, a body must be embalmed only if it will be transported by common carrier (such as a train or an airplane) and it will not reach its destination within 24 hours. (New Jersey Health Department Regulation § 8:9-1.7 (2018).)

**2018 New Jersey Revised Statutes**
**Title 26 - HEALTH AND VITAL STATISTICS**
**Chapter 6**
**Section 26:6-8 - Duty to furnish particulars; verification.**

**Universal Citation:** NJ Rev Stat § 26:6-8 (2018)

Section: 26:6-8: Duty to furnish particulars; verification.

26:6-8. In the execution of a death certificate, the personal particulars shall be obtained by the funeral director from the person best qualified to supply them. The death and last sickness particulars shall be supplied by the attending, covering or resident physician; or if there is no attending, covering or resident physician, by an attending registered professional nurse licensed by the New Jersey Board of Nursing under P.L.1947, c. 262 (C. 45:11-23 et seq.); or if there is no attending, covering or resident physician or attending registered professional nurse, by the county medical examiner. Within a reasonable time, not to exceed 24 hours after the pronouncement of death, the attending, covering or resident physician or the county medical examiner shall execute the death certification. The burial particulars shall be supplied by the funeral director. The attending, covering or resident physician, the attending registered professional nurse, or the county medical examiner and the funeral director shall certify to the particulars supplied by them by signing their names below the list of items furnished, or by otherwise authenticating their identities and the information that they have provided through the NJ-EDRS. If a person acting under the direct supervision of the State Medical Examiner, a county medical examiner, funeral director, attending, covering or resident physician, or licensed health care facility or other public or private institution providing medical care, treatment or confinement to persons, which is registered with the NJ-EDRS, is not authorized to authenticate the information required on a certificate of death or fetal death, that person may enter that information into the NJ-EDRS in anticipation of its authentication by the State Medical Examiner or a county

medical examiner, funeral director, attending, covering or resident physician, local registrar, deputy registrar, alternate deputy registrar or sub-registrar, as applicable.

Amended 1965, c.78, s.6; 1971, c.2, s.13; 1983, c.308, s.2; 2003, c.221, s.5.

## X. AND XI.  STATEMENT OF A CLAIM AND FACTS

**I am the Plaintiff that can show under New Jersey law that permits recovery for claim statement of a claim against Defendant(s) for intentional or negligent infliction of emotional distress based upon the mishandling of a corpse.** This was based upon the New Jersey Supreme Court's decision in Strachan v. John F. Kennedy Memorial Hospital that "an action based on the mishandling of a corpse is in essence an action for recovery for emotional distress.  That is, in New Jersey, a plaintiff could not recover based on mishandling a corpse; rather, recovery must be based on the emotional distress, if any, that the mishandling had on the plaintiff.
Having ruled that the torts at issue were intentional or negligent infliction of emotional distress (in this case, as a result of mishandling a corpse), the court proceeded to consider the necessary elements of those torts and whether plaintiffs had sufficient evidence to prove each of them.

I am the Plaintiff(s) that states a claim against the Defendant(s) for intentional infliction of emotional distress, Plaintiff can show she has met her burden of proof to prove that:

1) the Virtua Health, Inc., Denise Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s) conduct was intentional (or reckless) and outrageous; and
2) that this conduct was the proximate cause of severe intentional infliction of emotional distress based on the mishandling of Flakewood Tucker, Jr., corpse. The resultant emotional distress was so severe that no reasonable person like Anita Tucker, Karen Tucker, Flakewood Alan Tucker, III., could be expected to endure it.

I am the Plaintiff(s) that states a claim against the Defendant(s) for negligent infliction of emotional distress, Plaintiff can show she has met her burden of proof to prove that:
1) ) the Virtua Health, Inc., Denise Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s) had a duty of care 2) the duty of care was owed to Plaintiff(s); 3) ) the Virtua Health, Inc., Denise Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s) breached that duty; 4) Plaintiff(s) were harmed or injured; and 5) the breach caused the harm or injury of negligent infliction of emotional distress based on the mishandling of Flakewood Tucker, Jr., corpse.

## XII.  STATEMENT OF CLAIM AND FACTS
## NJ CONSUMER FRAUD

I am the Plaintiff(s) that is entitled to **state a claim for NJ Consumer Fraud** against the Defendant(s) Virtua Health, Inc., Denise Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s) for false promises, misrepresentations, and concealment or omission of material facts all constitute deceptive practices under these statutes.

38

Plaintiff can explain that the capacity to mislead is the prime ingredient of all types of consumer fraud." Argabright v. Rheem Manufacturing Company, 201 F. Supp. 3d 578, 605–06 (D.N.J. 2016) (discussing the NYGBL § 349 and NJCFA).

(1) Plaintiff can show the Virtua Health, Inc., Denise Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s) has engaged in an act or practice that is deceptive or misleading in a material way;
(2) I am the Plaintiff(s) that has been injured by reason thereof; and
(3) the Virtua Health, Inc., Denise Pulliam and Jon Doe(s) Defendant(s) and Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s) deceptive act or practice is consumer oriented." Koch v. Greenberg, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014) (quoting Gaidon v. Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 343–44, 704 N.Y.S.2d 177, 725 N.E.2d 598 (Ct. App. 1999).

I am the Plaintiff that can establish a prima facie case under the NJCFA, alleging
(1) unlawful taking and possession of Flakewood Tucker, Jr. Corpse, unlawful desecration, abuse of body, and embalming of Flakewood Tucker, Jr, without authorization from Plaintiff(s); theft of corpse conduct by the Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s), negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT
(2) an ascertainable loss in the amount of $2,000,000 million dollars by Plaintiff; and
(3) a causal connection between the Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s), unlawful practice and the plaintiff's ascertainable loss." Angelo v. Fidelity & Guaranty Life Insurance Company, 2019 WL 330521, at *5 (D.N.J. 2019) (quoting MZL Capital Holdings, Inc. v. TD Bank, N.A., 734 F. App'x 101, 104 (3d Cir. 2018) (citing Zaman v. Felton, 98 A.3d 503, 516 (N.J. 2014)). Unlawful conduct falls into three general categories: affirmative acts, knowing omissions, and violation of regulations. Chaudhri, 2018 WL 6322623 at *6 (citing N.J.S.A. 56:8-2, 56:8-4).

An affirmative misrepresentation under the NJCFA is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." Id. (citation omitted). "Unlike common law fraud, the NJCFA does not require proof of reliance." Id. ((quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 606 (3d Cir. 2012)). Additionally, "[w]hen the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994).

I am the Plaintiff(s) asserting a claim based on an omission that can demonstrate that the Carl Miller Funeral Home, Levi Coomb, III., Pamela Dabney, Alexis Coombs, and Jon Doe(s) Defendant(s):
(1) knowingly concealed they had committed theft of body, unlawfully taken possession of Flakewood Tucker, Jr., corpse, unlawfully desecrated body and embalmed body without authorization from Plaintiff(s)
(2) is a material fact (3) with the intention that Plaintiff and the Camden Police Department rely upon the concealment.'" Galo Coba, v. Ford Motor Company, 932 F.3d 114, 124 (3d Cir. 2019) (quoting Judge v. Blackfin Yacht Corp., 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003)) (citing N.J.S.A. 56:8-2).

39

Plaintiff can show Defendant(s) Levi Coombs, III, had superior knowledge as a NJ Licensed mortician knew or should have known his omission that Carl Miller Funeral Home, Defendant(s) committed theft, unlawful taking or possession of Flakewood Tucker, Jr., corpse when Defendant(s) knew they did not offer, enter into or agree on a funeral service contract, had no legal authorization to embalm Flakewood Tucker, Jr., corpse; did not know how to contact Flakewood Tucker, Jr. family, made a false statement to Camden Police Department they had verbal authorization to take body knowing it was a negligent and fraudulent misrepresentation; Defendant(s) made concealed facts and made a false statement to Mays Funeral Home that they did not take or have Flakewood Tucker, Jr., corpse; Defendant(s) made a false statement to Plaintiff on February 28, 2022 that they did unlawfully take Flakewood Tucker, Jr., corpse by mistake but did not know who he was or how to contact family shows that the Defendant(s) acted with knowledge, and intent is an essential element of the fraud. Cameron v. South Jersey Pubs, Inc., --- A.3d ---, 2019 WL 3022352, at *10 (N.J. Super. Ct. Appl Div. July 11, 2019) (citations omitted).

Plaintiffs also allege a "knowing omission" claim as follows:
(1) Defendant(s) Levi Coombs, III, Pamela Dabney, Alexis Coombs and Carl Miller Funeral Home knew of the alleged unlawful theft, taking and possession and unlawful desecration, mishandling and embalming without authorization of Flakewood Tucker, Jr., human remains since at least Friday, February 25, 2022 but knowingly and intentionally concealed it from the public; Mays Funeral Home Plaintiff(s) contracted agent for funeral services; concealed it from the Camden Police Department (2) the alleged theft, unlawful taking or possession, unlawful desecration and unauthorized embalming of Flakewood Tucker, Jr., human remains was material to Plaintiffs' decision file criminal charges against Defendant(s) at the Marlton, NJ Police Department and Camden Police Department and (3) Defendant(s) Levi Coombs, III, Pamela Dabney, Alexis Coombs and Carl Miller Funeral Home intended to conceal the alleged theft, unlawful taking or possession, unlawful desecration and unauthorized embalming of Flakewood Tucker, Jr., human remains from its public customers like the Camden Policemen so that they would purchase Defendant(s) Levi Coombs, III, Pamela Dabney, Alexis Coombs and Carl Miller Funeral Home Services.

Plaintiffs have related their own experiences with Defendant(s) alleged theft of corpse, unlawful taking or possession, unlawful desecration, mishandling and unauthorized embalming of Flakewood Tucker, Jr., human remains; abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains and Plaintiff can provide numerous examples of other customers like Moses Knight body was placed in the wrong clothes, wrong coffin and wrong family viewing; A Gloucester County woman is suing a funeral home that she says let her brother's body "decompose" in their facility before the funeral was set to take place. shkeya Pratt-Williams filed suit Wednesday against Carl Miller Funeral Home in Camden and its employees for allowing the body of her recently deceased brother, John Ross Pratt, to decompose in a garage shows others who have suffered the same problems. Plaintiffs have obtained some direct proof regarding the Defendant(s) unlawful misconduct.

Plaintiffs cannot be faulted for not having access to more of Defendant(s) Levi Coombs, III, Pamela Dabney, Alexis Coombs and Carl Miller Funeral Home documents, especially considering that the relevant documents may, if Plaintiffs' claims are true, reveal  fraud. See Rabinowitz v. American Water Resources, LLC, 2019 WL 1324492, at *7 (D.N.J. 2019) (denying a motion to dismiss a plaintiff's putative consumer fraud class action and questioning what more the plaintiff could allege in that stage of the case other than citing to a "smoking gun" admission on the part of the defendant); Burroughs v. PHH Mortgage Corporation, 2016 WL 1389934 at *4 (D.N.J. 2016) ("The party who has defrauded another cannot use the success of that fraud as a sword to defeat the victim's claims against it."); Rowen Petroleum Properties, LLC v.

Hollywood Tanning Systems, Inc., 2009 WL 1085737 at *6 (D.N.J. 2009) ("[T]he failure of plaintiff to be more specific with regard to the defendants' individual conduct is not fatal to the claims at this motion to dismiss stage, since it is only the defendants themselves who possess the knowledge of the alleged bait and switch."); Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control."); Shapiro v. UJB Financial Corp., 964 F.2d 272, 234 (3d Cir. 1992) (explaining that Rule 9(b) has stringent pleading requirements, but "the courts should be 'sensitive' to the fact that application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'"

## XIII. STATEMENT OF CLAIMS AND FACTS

I am the Plaintiff that is entitled to the right to civil suit against the Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) for statement of claims for negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, Tort Action for Interference with a Dead Body, unlawful desecration of Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains; , 4.43, Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT showing the violations of laws they have alleged committed that supports Plaintiff(s) claims are explained under:

### Federal Trade Commission:
The law does not require embalming. However, the person with the right to control disposition must accept or decline embalming by signing a specific form prescribed by the Bureau.

PART 453—FUNERAL INDUSTRY
PRACTICES  https://www.ftc.gov/sites/default/files/16cfr453.pdf

Sec. 16 (CFR) code of federal regulations §
453.1 Definitions.
453.2 Price disclosures.
453.3 Misrepresentations.
453.4 Required purchase of funeral goods or funeral services.
453.5 Services provided without prior approval.
453.6 Retention of documents.
453.7 Comprehension of disclosures.
453.8 Declaration of intent.
453.9 State exemptions.
AUTHORITY: 15 U.S.C. 57a(a); 15 U.S.C. 46(g); 5 U.S.C. 552.
SOURCE: 59 FR 1611, Jan. 11, 1994, unless otherwise noted.
§ 453.1 Definitions.
(a) Alternative container. An ''alternative container'' is an unfinished wood box or other non-metal receptacle
or enclosure, without ornamentation or a fixed interior lining, which is designed for the encasement of human remains and which
is made of fiberboard, pressed-wood, composition materials (with or without an outside covering)
or like materials.
(b) Cash advance item. A ''cash advance item'' is any item of service or merchandise described to a purchaser
as a ''cash advance,'' ''accommodation,'' ''cash disbursement,'' or similar term. A cash advance item is also any
item obtained from a third party and paid for by the funeral provider on the purchaser's behalf. Cash advance items

41

may include, but are not limited to:

cemetery or crematory services; pallbearers; public transportation; clergy honoraria; flowers; musicians or singers; nurses; obituary notices; gratuities and death certificates.

16 CFR § 453.3 - Misrepresentations. (a) Embalming provisions. (1) Deceptive acts or practices. In selling or offering to sell funeral goods or funeral services to the public, it is a deceptive act or practice for a funeral provider to:

(i) Represent that state or local law requires that a deceased person be embalmed when such is not the case;

(ii) Fail to disclose that embalming is not required by law except in certain special cases, if any.

(2) Preventive requirements. To prevent these deceptive acts or practices, as well as the unfair or deceptive acts or practices defined in §§ 453.4(b)(1) and 453.5(2), funeral providers must:

(i) Not represent that a deceased person is required to be embalmed for:

(A) Direct cremation; (B) Immediate burial; or (C) A closed casket funeral without viewing or visitation when refrigeration is available and when state or local law does not require embalming; and (ii) Place the following disclosure on the general price list, required by § 453.2(b)(4), in immediate conjunction with the price shown for embalming: "Except in certain special cases, embalming is not required by law. Embalming may be necessary, however, if you select certain funeral arrangements, such as a funeral with viewing. If you do not want embalming, you usually have the right to choose an arrangement that does not require you to pay for it, such as direct cremation or immediate burial." The phrase "except in certain special cases" need not be included in this disclosure if state or local law in the area(s) where the provider does business does not require embalming under any circumstances.

(b) Casket for cremation provisions—(1)

16 CFR § 453.5 - Services provided without prior approval.

(a) Unfair or deceptive acts or practices. In selling or offering to sell funeral goods or funeral services to the public, it is an unfair or deceptive act or practice for any provider to embalm a deceased human body for a fee unless:

(1) State or local law or regulation requires embalming in the particular circumstances regardless of any funeral choice which the family might make; or

(2) Prior approval for embalming (expressly so described) has been obtained from a family member or other authorized person; or

(3) The funeral provider is unable to contact a family member or other authorized person after exercising due diligence, has no reason to believe the family does not want embalming performed, and obtains subsequent approval for embalming already performed (expressly so described). In seeking approval, the funeral provider must disclose that a fee will be charged if the family selects a funeral which requires embalming, such as a funeral with viewing, and that no fee will be charged if the family selects a service which does not require embalming, such as direct cremation or immediate burial.

(b) Preventive requirement. To prevent these unfair or deceptive acts or practices, funeral providers must include on the itemized statement of funeral goods and services selected, required by § 453.2(b)(5), the statement: "If you selected a funeral that may require embalming, such as a funeral with viewing, you may have to pay for embalming. You do not have to pay for embalming you did not approve if you selected arrangements such as a direct cremation or immediate burial. If we charged for embalming, we will explain why below."

16 CFR § 453.8 - Declaration of intent.

(a) Except as otherwise provided in § 453.2(a), it is a violation of this rule to engage in any unfair or deceptive acts or practices specified in this rule, or to fail to comply with any of the preventive requirements specified in this rule;

(b) The provisions of this rule are separate and severable from one another. If any provision is determined to be invalid, it is the Commission's intention that the remaining provisions continue in effect.

(c) This rule shall not apply to the business of insurance or to acts in the conduct thereof.

5.  Statement of funeral goods and services" means the itemized written statement required to be given to each person making funeral arrangements in accordance with the regulations of the Federal Trade Commission (16 C.F.R. 453.2) and the board (N.J.A.C.13:36-9.8). L.1993,c.147,s.1; amended 1994,c.163,s.1. 45:7-83.

6.  45:7-95. Funeral, disinterment, disposition of remains; written authorization.

7.  NJ State Board of Mortuary Science 45:7-33. Practice of embalming and funeral directing,

8.  45:7-63. Permission to inject fluid into body;

9. 45:7-65.5. Violations;

10. 45:7-82. Definitions used in C.45:7-32 et seq., C.45:7-65.3 and C.45:7-82 et al. As used in this act, in P.L.1952, c.340 (C.45:7-32 et seq.) and in section 18 of P.L.1960, c.184 (C.45:7- 65.3): "Assigned funeral insurance policy;

## 11. 13:36-5.17 REMOVAL OF HUMAN REMAINS; AUTHORIZATION

a) No person shall remove human remains from any residence or institution without first securing authorization consenting to the removal from the legal next of kin, consistent with N.J.S.A. 45:27-22, or a person legally entitled to grant said authorization.
b) All removals of human remains shall be made pursuant to the direction of a registered mortuary.
c) A registered mortuary shall ensure that all persons providing removal services utilize universal precautions as set forth in N.J.A.C. 13:36-6.4 and comply with all applicable Board rules.

## 12. 13:36-5.18 DISPOSITION OF HUMAN REMAINS

a) Whenever human remains are entrusted to the care of a registered mortuary for disposition, the registered mortuary shall retain professional responsibility for the remains from the point of removal to the final place of disposition or upon transfer to another registered mortuary for disposition.

b) Notwithstanding (a) above, a licensed practitioner of mortuary science shall be present at the time of final disposition of human remains, consistent with N.J.A.C. 13:36-8.10, and shall comply with the requirements of N.J.A.C. 8:9 and shall not remove any body part or dispose of the remains in any manner, except as permitted by law and as authorized by the person legally entitled to grant said authorization.

c) Viscera shall be treated in the same manner as the remains and shall be disposed of with the remains.

## 13. 13:36-8.7 AUTHORIZED SURRENDER OF HUMAN REMAINS

A licensed practitioner of mortuary science shall promptly surrender human remains upon proper direction and authorization of the person who, in accordance with N.J.S.A. 45:27-22, is lawfully entitled to its custody.

## 14. 13:36-8.8 AUTHORIZATION TO EMBALM HUMAN REMAINS

No licensed practitioner of mortuary science shall take possession of or embalm human remains without first being directed and fully authorized to do by those whom, in accordance with N.J.S.A. 45:27-22, are charged with the duties of interment.

## 15. 13:36-8.10 PRESENCE OF LICENSEE FOR DISPOSITION OF DEAD HUMAN BODY

Except for the transfer of remains from a place of temporary storage to a place of final entombment or interment within a single cemetery as provided in N.J.A.C. 13:44J-8.4, no interment, cremation or other disposition of a dead human body, or any disinterment thereof, shall be made by any person in the State of New Jersey unless a New Jersey licensed practitioner of mortuary science is present at the time of disposition, provided, however, that this rule shall not apply to a disinterment resulting from a court order in connection with a criminal investigation.

16. Services of funeral director and staff means the services, not included in prices of other categories in N.J.A.C. 13:36-9.7, which may be furnished by a funeral provider in arranging and supervising a funeral, such as conducting the arrangement conference, planning the funeral, obtaining necessary permits and placing obituary notices.

## 17. 13:36-9.2 VIOLATIONS

It shall be a violation of the rules of this subchapter to engage in unfair or deceptive acts or practices as defined herein or to fail to comply with the preventive requirements specified herein; any such action may be deemed to be professional misconduct.

## 18. 13:36-9.8 PROVISION OF STATEMENT OF FUNERAL GOODS AND SERVICES SELECTED

a) Funeral providers shall provide a Statement of Funeral Goods and Services Selected for retention to each person who arranges a funeral or other disposition of human remains, at the conclusion of the discussion of arrangements. The Statement of Funeral Goods and Services Selected shall conform to the requirements of N.J.A.C. 13:36-1.9.

b) The itemized cash advance prices shall be given to the extent known or reasonably ascertainable. If the cash advance prices are not known or reasonably ascertainable, a good faith estimate shall be given and a written statement of the actual charges shall be provided before the final bill is paid.

c) Funeral providers may give persons any other price information in any other format, in addition to that required by N.J.A.C. 13:36-9.5, 9.6 and 9.7 provided that the Statement of Funeral Goods and Services Selected required by this section is given when required.

**19.  13:36-9.9 EMBALMING PROVISIONS a) In seeking or offering to sell funeral goods or funeral services to the public, it is a deceptive act or practice for a funeral provider to**:
1) Represent that State or local law requires that a deceased person be embalmed when such is not the case;
2) Fail to disclose that embalming is not required by law except in certain special cases.
b) To prevent the deceptive acts or practices mentioned in (a) above, as well as the unfair or deceptive acts or practices defined in N.J.A.C. 13:36-9.16 and 9.17(a), funeral providers shall:
1) Not represent that a deceased person is required to be embalmed for direct cremation, immediate burial, a funeral using a sealed casket, or if refrigeration is available and the funeral is without viewing or visitation and with a closed casket when State or local law does not require
embalming; and
2) Provide on the general price list the disclosure statement required pursuant to N.J.A.C. 13:36-9.7(d)2.

**20.  13:36-9.17 EMBALMING PROVIDED WITHOUT PRIOR APPROVAL** a) In selling or offering to sell funeral goods or funeral services to the public, it is an unfair or deceptive act or practice for any provider to embalm a deceased human body for a fee unless:
1) State or local law or regulation requires embalming in the particular circumstances regardless of any funeral choice which the family might make; or
2) Prior approval for embalming (expressly so described) has been obtained from a family member or other authorized person; or
3) The funeral provider is unable to contact a family member or other authorized person after exercising due diligence, has no reason to believe the family does not want embalming performed, and obtains subsequent approval for embalming already performed (expressly so described).

In seeking approval, the funeral provider shall disclose that a fee will be charged if the family selects a
funeral which requires embalming, such as a funeral with a viewing, and that no fee will be charged if the
family selects a service which does not require embalming, such as direct cremation or immediate burial.

b) To prevent the unfair or deceptive acts or practices mentioned in (a) above, funeral providers shall include on the contract, final bill, or other written evidence of the agreement or obligation given to the customer, the disclosure statements required pursuant to N.J.A.C. 13:36-1.9(a).

21.  13:36-9.19 COMPREHENSION OF DISCLOSURES To prevent the unfair or deceptive acts or practices specified in this subchapter, funeral providers shall make all disclosures required in a clear and conspicuous manner.

22.  13:36-11.15 PRESUMPTION; AIDING AND ABETTING; VICARIOUS LIABILITY; DUTY TO REPORT VIOLATIONS
a) Any provider shall be conclusively presumed to know his, her or its obligations relevant to the
deposit, maintenance, application and refund of funeral trust funds and funeral insurance policies.
b) Any provider or any person who knowingly aids, abets or otherwise assists any other person to violate any of the provisions of the preneed statutes or this subchapter, shall be equally as culpable as a principal, and shall be subject to discipline by the Board as a principal.
c) Any provider shall be liable for any acts performed by any other person in any matter involving the preneed statutes or this subchapter, provided that the provider authorizes said person to act in his, her or its stead or holds out said other person to the public as apparently authorized to act in his, her or its stead.
d) Any provider or licensee who has knowledge of any violation of this subchapter or of the
preneed statutes by any licensee, person, firm or corporation, shall immediately report such violation to the Board and shall provide to the Board all evidence and knowledge of said violation.

**23.  13:36-11.16 PRENEED LEDGERS OF ACTIVE PREPAID FUNERAL AGREEMENTS AND PRENEED FUNERAL ARRANGEMENTS; MAINTENANCE OF RECORDS OF PREPAID AGREEMENTS AND PRENEED ARRANGEMENTS; COMPILATION OF PRENEED LEDGER; BIENNIAL REGISTRATION**

24.  NJ Department of Health, Healthcare Facilities, Evaluation and Licensing

25. Title 8 – Health Chapter 2A – Death Records
NJ Admin. Code 8:2A-1.1 – 8:2A-1.2 Application and Scope
26:8-1 Recording of Death Certificates and Maintenance of Death Records

26. Chapter 9 – Preparation, Handling, Transportation, Burial and Disinterment of Dead
Human Bodies Code 8:9-1.1 to 8:9-1.11

27. Mandatory Reporting
In 2010, New Jersey's APS law (N.J.S.A. 52:27D-406 to 426) was amended to require health care professionals, law enforcement officers, firefighters, paramedics or emergency medical technicians who have reasonable cause to believe that a vulnerable adult is the subject of abuse, neglect or exploitation to report that information to the county Adult Protection Services office.

**28. 45:7-33. *Practice of embalming and funeral directing* declared occupation subject to strict regulation** In the interest of, and to better secure, the public health, safety and welfare and for the more efficient administration and supervision of sanitary codes and health regulations, the practice of mortuary science and the practice of embalming and funeral directing are hereby declared to be occupations charged with a high degree of public interest and subject to strict regulation and control. L.1952, c. 340, p. 1097, s. 2. Amended by L.1960, c. 184, p. 760, s. 1. 45:7-34.

**Definitions As used in this act:**
(a) "Board" means the State Board of Mortuary Science of New Jersey.
(b) "Embalming" means the disinfecting or preservation of a dead human body, entirely or in part by the use of chemical substances, fluids or gases in the body, or by introduction of the same into the body by vascular or hypodermic injection, or by direct application into the organs or cavities.

**(c) "Funeral directing" means**
(1) the engaging in or conducting or holding one's self out as being engaged in or conducting the preparation (other than embalming) for burial or disposal and the direction or supervision of burial or disposal of dead human bodies; or
(2) maintaining, using or operating a mortuary; or
(3) in connection with one's name or mortuary using the words "mortician" or "funeral director" or "undertaker" or any other words or title of like import or signification.
"Funeral directing" also means the engaging in or making, or holding one's self out as being engaged in or making, funeral arrangements, including at need funeral arrangements or preneed funeral arrangements; or the offering or holding one's self out as offering the opportunity to purchase or enroll in a prepaid funeral agreement. As used in this definition, "funeral arrangements," "at need funeral arrangements," "preneed funeral arrangements" and "prepaid funeral agreement" shall have the same meaning as they are defined in section 1 of P.L.1993, c.147 (C.45:7-82).
(d) "Mortuary science" means embalming and funeral directing, as the same are herein defined.
(e) "Embalmer" means a qualified person who practices or engages in embalming, as the same is herein defined.
(f) "Funeral director" includes "undertaker" and "mortician" and means a qualified person who practices or engages in funeral directing, as the same is herein defined.
(g) "Practitioner of mortuary science" means a qualified person who practices or engages in mortuary science, as the same is herein defined and who
(1) shall be licensed under the provisions of this act as a practitioner of mortuary science, or
(2) holds a license as both an embalmer and a funeral director under the provisions of any prior law or laws of this State, or
(3) holds a license as an embalmer under the provisions of any prior law or laws of this State and shall have been licensed under the provisions of section 21 of P.L.1952, c.340 (C.45:7-52) as a funeral director, or
(4) holds a license as a funeral director under the provisions of any prior law or laws of this State and shall have been licensed under the provisions of section 21 of P.L.1952, c.340 (C.45:7-52) as an embalmer.

(h) "Mortuary" means any place or premises devoted to or used in the care and preparation for burial, disposition, or transportation of dead human bodies, or any specifically designated location or address where any person or persons shall hold forth that he, she, or they are engaged in the practice of mortuary science, embalming or funeral directing, and shall mean and include any premises of any kind whatsoever in which mortuary science in any of its branches is practiced or in which more than five funerals may be conducted in any calendar year, except publicly owned buildings, places of worship and meeting places of fraternal organizations.

45

(i) "Registered trainee" means a person who is duly registered with the board and who is engaged in the State of New Jersey in learning to practice as a practitioner of mortuary science under the personal instruction and supervision of a person duly licensed as a practitioner of mortuary science and who has an annual case volume as hereinafter provided in section 18 of this act. L.1952,c.340,s.3; amended 1960,c.184,s.2; 1993,c.147,s.14.

**29. 45:7-63. Permission to inject fluid into body** required, when; arsenical or other poisonous agents No person shall inject any fluid or substance into any cavity or artery of the body of any person who has come to a sudden, violent or untimely death, or of any person found dead, the manner of whose death is not known, until permission is obtained from the county medical examiner of the county in which the dead body lies. No person shall employ, for the purpose of the practice of mortuary science, funeral directing or embalming, any arsenical or other poisonous agent which may by its presence in the viscera prevent the detection of criminal usage of the poisonous agent before the death of the individual occurred; but this provision shall not prohibit the use by any association incorporated under article 4 of chapter 9 of Title 45 of the Revised Statutes, of any substance for the preservation of dead bodies which have legally come into its possession. L.1952, c. 340, p. 1113, s. 32. Amended by L.1971, c. 2, s. 18, eff. Jan. 15, 1971.

**30. 45:7-65.5. Violations**; penalty Any person who violates this act shall be guilty of a misdemeanor and shall remain liable for any other penalties which may be imposed by the board, where applicable. L.1979, c. 201, s. 2, eff. Sept. 20, 1979.

**31. 45:7-82. Definitions used in C.45:7-32 et seq., C.45:7-65.3 and C.45:7-82 et al. As used in this act,** in P.L.1952, c.340 **(C.45:7-32 et seq.) and in section 18 of P.L.1960, c.184 (C.45:7- 65.3):**
"Assigned funeral insurance policy" means any insurance policy or annuity contract that is not a newly issued funeral insurance policy, but that, at the time an assignment was made of some or all of its proceeds, was intended to provide funds to the provider, whether directly or indirectly, at the time of the insured's death in connection with a prepaid funeral agreement.

"At need funeral arrangements" means funeral arrangements made with the survivors or personal representative of a person who has already died for that person's funeral. "Board" means the State Board of Mortuary Science of New Jersey.

"Credit life insurance" means insurance on the life of a debtor pursuant to or in connection with a specific loan or other credit transaction.

"Deliver" or "delivery" means the conveyance of actual control and possession of prepaid funeral goods that have been permanently relinquished by a provider, or other person, firm or corporation, or an agent thereof, to the purchaser or person paying the moneys, or personal representative of the intended funeral recipient.

Delivery has not been made if the provider, or other person, firm or corporation, or an agent thereof:
(1) Arranges or induces the purchaser or person paying the moneys to arrange for the storage or warehousing of prepaid funeral goods ordered pursuant to a prepaid funeral agreement, with or without evidence that legal title has passed; or
(2) Acquires or reacquires actual or constructive possession or control of prepaid funeral goods after their initial delivery to the purchaser or person paying the moneys or personal representative of the intended funeral recipient. This definition of delivery shall apply to this term as used in this act, notwithstanding the provisions set forth in the Uniform Commercial Code, Title 12A of the New Jersey Statutes.

"Funeral arrangements" means funeral and burial plans made through a mortuary, including the selection of plans for the furnishing of funeral goods and services pursuant to a completed plan of bodily disposition and the act of offering the opportunity to purchase or to enroll in a prepaid funeral agreement by the mortuary. "Funeral insurance policy" means any newly issued funeral insurance policy or assigned funeral insurance policy.

"Funeral trust" means a commingled or non-commingled account held in a pooled trust or P.O.D. account, established in accordance with P.L.1957, c.182 (C.2A:102-13 et seq.) or P.L.1985, c.147 (C.3B:11- 16 et al.), which is intended as the depository for cash payments connected with a prepaid funeral agreement. "Guaranteed price agreement" means a prepaid funeral agreement under which, in exchange for the proceeds of a funeral trust or funeral insurance policy, the provider agrees to provide the stated goods and services in the future, regardless of whether or not the retail value of those goods and services exceeds the funds available from the funeral trust or funeral insurance policy at the time of death of the intended funeral recipient.

46

"Intended funeral recipient" means the person named in a prepaid funeral agreement for whose bodily disposition the prepaid funeral agreement is intended to provide. The intended funeral recipient may or may not be the purchaser. "Newly issued funeral insurance policy" means any insurance policy or annuity contract that, at the time of issue, was intended to provide, or was explicitly marketed for the purpose of providing, funds to the provider, whether directly or indirectly, at the time of the insured's death in connection with a prepaid funeral agreement.

"Non-guaranteed price agreement" means a prepaid funeral agreement funded with a funeral trust or funeral insurance policy, the proceeds of which the provider will apply to the current retail value of the prepaid funeral goods and services previously selected at the time of death of the intended funeral recipient, but which agreement shall not bind the provider to provide the goods and services if the value thereof exceeds the funds available at the time of death of the intended funeral recipient.

"Payable on death account" or "P.O.D. account" means an account payable, on request to the purchaser or intended funeral recipient of a prepaid funeral agreement during the lifetime of the intended funeral recipient and on his death, to a provider of funeral goods and services.

"Pooled trust" means a pooled trust account established pursuant to P.L.1985, c.147 (C.3B:11-16 et al.).

**32. "Preneed funeral arrangements" means funeral arrangements made with an intended funeral recipient or his guardian, agent or next of kin, for the funeral of the intended funeral recipient.**
"Prepaid funeral agreement" means a written agreement and all documents related thereto made by a purchaser with a provider prior to the death of the intended funeral recipient, with which there is connected a provisional means of paying for preneed funeral arrangements upon the death of the intended funeral recipient by the use of a funeral trust or funeral insurance policy, made payable to a provider and in return for which the provider promises to furnish, make available or provide the prepaid funeral goods or services, or both, specified in the agreement, the delivery of which occurs after the death of the intended funeral recipient.

"Prepaid funeral goods" means personal property typically sold or provided in connection with a funeral, or the final disposition of human remains, including, but not limited to, caskets or other primary containers, cremation or transportation containers, outer burial containers, vaults, as defined in N.J.S.8A:1-2, memorials as defined in N.J.S.8A:1-2, funeral clothing or accessories, monuments, cremation urns, and similar funeral or burial items, which goods are purchased in advance of need and which will not be delivered until the death of the intended funeral recipient named in a prepaid funeral agreement. Prepaid funeral goods shall *not* mean the sale of interment spaces and related personal property offered or sold by a cemetery *company as provided* for in N.J.S.8A:1-1 et seq. "Prepaid funeral services" means those services typically provided in connection with a funeral, or the final disposition of human remains, including, but not limited to, funeral directing services, embalming services, care of human remains, preparation of human remains for final disposition, transportation of human remains, use of facilities or equipment for viewing human remains, visitation, memorial services or services which are used in connection with a funeral or the disposition of human remains, coordinating or conducting funeral rites or ceremonies and similar funeral or burial services, including limousine services provided in connection therewith, which services are purchased in advance of need and which will not be provided or delivered until the death of the intended funeral recipient named in a prepaid funeral agreement. Prepaid funeral services shall not mean the sale of services incidental to the provision of interment spaces or any related personal services offered or sold by a cemetery company as provided for in N.J.S.8A:1-1 et seq.

33. "Provider" means a person, firm or corporation duly licensed and registered pursuant to the "Mortuary Science Act," P.L.1952, c.340 (C.45:7-32 et seq.) to engage in the business and practice of funeral directing or mortuary science, or an individual serving as an agent thereof and so licensed:

(1) Operating a duly registered mortuary in accordance with P.L.1952, c.340 (C.45:7-32 et seq.) and the regulations promulgated thereunder;

(2) Having his or its business and practice based within the physical confines of the registered mortuary; and

(3) Engaging in the practice of making preneed funeral arrangements, including, but not limited to, offering the opportunity to purchase or enroll in prepaid funeral agreements. "Purchaser" means the person named in a prepaid funeral agreement who purchases the prepaid funeral goods and services to be provided thereunder. The purchaser may or may not be the intended funeral recipient. If the purchaser is different than the intended funeral recipient, it is understood that the relationship of the purchaser to the intended funeral recipient includes a means to provide administrative control over the agreement on behalf of

47

the intended funeral recipient. "Retail installment contract" means an agreement to pay the purchase price of goods or services in two or more installments over a period of time.

**34. "Statement of funeral goods and services" means the itemized written statement required to be given to each person making funeral arrangements in accordance with the regulations of the Federal Trade Commission (16 C.F.R. 453.2) and the board (N.J.A.C.13:36-9.8). L.1993,c.147,s.1; amended 1994,c.163,s.1.**

**35. 45:7-83. Requirements for seller of certain funeral arrangements, agreements**
a. No person, firm or corporation shall sell, or offer to sell, or make or offer to make at need funeral arrangements, preneed funeral arrangements or prepaid funeral agreements, unless that person, firm or corporation:
(1) is duly licensed and registered pursuant to the "Mortuary Science Act," P.L.1952, c.340 (C.45:7-32 et seq.), to engage in the business and practice of funeral directing or mortuary science; and
(2) has his or its business and practice based within the physical confines of the registered mortuary.

b. No person, firm or corporation, shall engage in the business and practice of funeral directing or mortuary science at any permanent facility that is not a registered mortuary.

c. Notwithstanding the foregoing, this section shall not be construed to prohibit an otherwise qualified person, firm or corporation from acting as a provider operating under a trade name or other assumed name or through a subsidiary of a corporation duly licensed and registered pursuant to P.L.1952, c.340 (C.45:7-32 et seq.) to engage in the business and practice of funeral directing or mortuary science. L.1993,c.147,s.2. 45:7-84.

36. Requirements for provider of certain funeral arrangements, agreements No provider shall enter into, or offer to enter into, a prepaid funeral agreement, or provide or offer to provide a funeral trust or funeral insurance policy in connection therewith, unless:

a. At the same time he makes preneed funeral arrangements for the intended funeral recipient on a statement of funeral goods and services;

b. He meets all requirements with respect to the making of a need funeral arrangements as otherwise required by law;

c. The insurance policy or annuity contract to be provided or offered as a newly issued funeral insurance policy complies with the provisions of section 24 of P.L.1993, c.147 (C.17B:17-5.1); d. If a newly issued funeral insurance policy is provided or offered, he is duly licensed as an insurance producer pursuant to P.L.1987, c.293 (C.17:22A-1 et seq.). L.1993,c.147,s.3; amended 1994,c.163,s.2. 45:7-85 Requirements for prepaid funeral agreements.

Every prepaid funeral agreement executed in this State shall:
a. Be signed by the provider, and the purchaser or the intended funeral recipient or the intended funeral recipient's guardian, agent or next of kin.
b. Include at least the following information:
(1) the name, address and telephone number of the mortuary to be utilized;
(2) the name of the individual licensee acting as or on behalf of the provider and the license number of that individual;
(3) the purchaser's name and address;
(4) the name of the intended funeral recipient;
(5) whether the agreement is a guaranteed price agreement or non-guaranteed price agreement, which term as applicable, shall be defined in the agreement in accordance with section 1 of this act;
(6) how the agreement is to be funded; and
(7) a statement of funeral goods and services or, if not included as part of the agreement, that a statement of funeral goods and services shall be provided.

c. Provide that all funeral arrangements are revocable, and that all funeral funding arrangements are severable from those funeral arrangements by the purchaser if alive, and if not, then by the intended funeral recipient, where they are different persons.

Upon the death of both the purchaser and the intended funeral recipient, the intended funeral recipient's next of kin, in the order provided in N.J.S.8A:5-18, shall have the right to revoke the funeral arrangements and to sever the funeral funding arrangements

from the funeral arrangements. Notwithstanding the above, a prepaid funeral agreement may provide that the funeral trust shall be irrevocable during the lifetime of the intended funeral recipient pursuant to section 1 of P.L.1991, c.502 (C.2A:102-16.1) or section 1 of P.L.1999, c.193 (C.2A:102-19).

In those instances where a revocable prepaid funeral agreement is revoked, the moneys used to fund the agreement shall be paid to the purchaser, if alive, and if not, then to the personal representative or estate of the deceased purchaser if the agreement is funded through a trust or, if the agreement is funded through a funeral insurance policy, to the named beneficiaries on the insurance policy or annuity.

d. Provide that, unless otherwise specified therein, a prepaid funeral agreement anticipates the provision of prepaid funeral goods and services in the area served by the provider. The agreement shall further provide that, if the intended funeral recipient's place of death is in a location other than that served by the provider, alternative funeral arrangements will be necessary.

e. Provide for the provider's substitution of any goods or services to be furnished or rendered thereunder for goods of equal quality, value and workmanship or services of equal quality and value in the event of the unavailability of any goods or services set forth in the agreement. Any changes in the price of the agreement resulting from such substitution of goods or services shall be reflected in the statement of funeral goods and services rendered.

f. Provide that, in the case of an agreement funded through a funeral trust, if the purchaser predeceases the intended funeral recipient where they are different persons, then the intended funeral recipient shall automatically assume the legal right to administer the funeral trust as purchaser, including the right to withdraw any and all funds held in the funeral trust, along with all other rights formerly held by the purchaser.

g. Provide that, upon the death of the intended funeral recipient, the provider shall calculate the current retail prices of the preneed funeral arrangements, and:
(1) in the case of a non-guaranteed prepaid funeral agreement, if there are insufficient funds to pay for the current retail prices of the prepaid funeral goods and services requested, the provider shall consult with the appropriate representative for the supplementation of the funds or the modification of the funeral arrangements set forth in the agreement prior to performance under the agreement.

h. Provide that, upon completion of performance under the agreement, the provider shall present a final bill.

i. Provide that if a prepaid funeral agreement is a guaranteed price agreement, the price guarantee is a guarantee and liability of the provider and not the guarantee and liability of the insurer issuing the funeral insurance policy when a funeral insurance policy is used or the trust depository administering the funeral trust when a funeral trust is used. L.1993,c.147,s.4; amended 1999, c.193, s.9. 45:7-86. Additional provisions In addition to those provisions required in section 4 of this act, agreements connecting a funeral insurance policy to a prepaid funeral agreement shall provide that:

a. Cancellation of the funeral arrangements will not cancel or otherwise invalidate the funeral insurance policy;
b. Cancellation, withdrawal of, or loans made against, the proceeds or cash value of the policy shall void any price guarantees and indicate, therefore, the likelihood that inadequate funds will exist to pay for the original arrangements as intended; and
c. Cancellation of the prepaid funeral agreement will not result in the refund of premiums paid. L.1993,c.147,s.5.

37. 45:7-87. Additional requirements In addition to the other requirements of this act, with respect to prepaid funeral agreements and the preneed funeral arrangements made in connection therewith:
a. If the provider is unable to provide the prepaid goods and services requested due to the revocation of the prepaid funeral agreement or funding arrangements or due to impossibility of performance, the moneys used to fund the agreement shall be paid to the purchaser, if alive, and if not, then to the personal representative of the deceased purchaser or his estate if the agreement is funded through a funeral trust or, if the agreement is funded through a funeral insurance policy, to the named beneficiaries of the policy.

b. As a condition to the performance of the agreement, the provider or an agent thereof shall deliver the prepaid funeral goods to the purchaser or personal representative of the intended funeral recipient, regardless of whether the agreement specifically provides therefor.

49

c. Unless the intended funeral recipient's next of kin inquiries about the prepaid funeral goods and services arranged for, the provider shall be entitled to presume that the arrangements on file are those intended. L.1993,c.147,s.6. 45:7-88. Naming of provider as beneficiary prohibited No provider shall knowingly permit, in conjunction with a prepaid funeral agreement, the naming of himself or itself as beneficiary of a policy, except that nothing in this section shall be construed to prohibit the assignment of proceeds to a provider as payment for a funeral bill, or such other mechanism that provides payments to providers for the goods or services rendered, and that provides for any excess proceeds to be paid to a named beneficiary or beneficiaries. L.1993,c.147,s.7. 45:7-89. Written statement to purchaser of new arrangements Where a provider, with the written consent of the purchaser, replaces a funeral trust used to fund a prepaid funeral agreement with a funeral insurance policy or converts an agreement funded by a funeral trust to one which is funded by a funeral insurance policy, the provider shall give to the purchaser a written statement which sets forth the material differences between the original and the new funding arrangements and which discloses the provider's earning of a commission based upon that transaction. L.1993,c.147,s.8.

### 38.  45:7-90 Prohibitions for providers.
No person shall: a. Advertise "discounts," "rebates" or other price reduction incentives:
(1) which are not actual reductions of the retail prices of a provider's current general price list; or
(2) which are based solely on a funeral insurance policy's premium rate tables.
b. In offering to provide preneed funeral arrangements or prepaid funeral agreements, use the word "trust" or "trust funded" in any name, advertisement or solicitation in a misleading manner.
c. Fund or finance preneed funeral arrangements or a prepaid funeral agreement through retail installment contracts, reverse mortgages or credit life insurance, or in any manner other than a funeral trust or funeral insurance policy.
d. Waive any provision of this act in any agreement in which a person pays money under, or in connection with, a prepaid funeral agreement. Any agreement to waive any portion of this act shall render the agreement voidable by the purchaser. L.1993, c.147, s.9; amended 2009, c.218, s.2. 45:7-91. Certain acts, fourth degree crimes A person is guilty of a crime of the fourth degree if he knowingly or purposefully solicits or induces any person to make a prepaid funeral agreement, whether funded with a funeral insurance policy or a funeral trust, with the intent to collect or charge more than the fair market value for prepaid funeral goods or services when the purchaser or intended funeral recipient is:

a. an aged, blind or disabled applicant for, or recipient of, benefits pursuant to the Supplemental Security Income Program under P.L.1973, c.256 (C.44:7-85 et seq.) or any Medicaid program under P.L.1968, c.413 (C.30:4D-1 et seq.) utilizing the eligibility criteria of the Supplemental Security Income Program in regard to burial spaces and funds set aside for burial expenses; or b. an aged, blind or disabled person who reasonably anticipates applying for, or receiving, the benefits specified in subsection a. of this section. L.1993,c.147,s.10. 45:7-92. Laws governing prepaid funeral agreements All prepaid funeral agreements executed on or after the effective date of this 1993 amendatory and supplementary act shall be governed pursuant to the applicable provisions of P.L.1957, c.182 (C.2A:102- 13 et seq.), P.L.1985, c.147 (C.3B:11-16 et al.) and this act. L.1993,c.147,s.11.

### 39.  45:7-93. Applicability of act
a. This act applies to the sale of prepaid funeral goods or services and the offering of those goods or services for sale by providers.
b. This act shall not apply to the sale of interment spaces or related personal property or personal services by a cemetery company as provided for in N.J.S.8A:1-1 et seq. L.1993,c.147,s.12.

45:7-94. Rules, regulations The State Board of Mortuary Science of New Jersey shall have jurisdiction to enforce the provisions of this act. The board is authorized to adopt such rules and regulations, pursuant to the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.), as may be necessary to effectuate the purposes of this act. L.1993,c.147,s.13.

### 40.  45:7-95. Funeral, disinterment, disposition of remains; written authorization.
A funeral director may permit the funeral, disinterment or disposition of human remains on the written authorization of a person who claims to be, and is believed to be, a person who has the right to control the funeral, disinterment or disposition as provided by sections 22 and 23 of P.L.2003, c.261 (C.45:27-22 and C.45:27-23).

A cemetery or funeral director shall not be liable for the funeral, disinterment or disposition as provided by sections 22 and 23 of P.L.2003, c.261 (C.45:27-22 and C.45:27-23). A cemetery or funeral director shall not be liable for the funeral, disinterment or disposition pursuant to this authorization unless it had reasonable notice that the person did not have the right to control the funeral, disinterment or disposition. If there are no known living relatives, a funeral director may rely on the written authorization of any person acting in good faith on behalf of the decedent. A person who signs an authorization for the funeral, disinterment or disposition of human remains warrants the truth of the facts stated, the identity of the person whose remains are disposed, and

50

the authority to order the funeral, disinterment or disposition. A cemetery or funeral director shall not be liable for the funeral, disinterment or disposition in accordance with the authorization unless it had reasonable notice that the representations were untrue or that the person lacked the right to control the funeral, disinterment or disposition. L.2003,c.261,s.41.

**41. 13:36-11.16 PRENEED LEDGERS OF ACTIVE PREPAID FUNERAL AGREEMENTS AND PRENEED FUNERAL ARRANGEMENTS; MAINTENANCE OF RECORDS OF PREPAID AGREEMENTS AND PRENEED ARRANGEMENTS; COMPILATION OF PRENEED LEDGER; BIENNIAL REGISTRATION**

a) Every provider shall maintain in his. her or its registered mortuary, in a single identifiable and accessible location, a ledger of all active prepaid funeral arrangements (the "Preneed Ledger"), provided, however, that any provider who operates more than one registered mortuary may keep all preneed ledgers so maintained in one location.
b) The Preneed Ledger may be kept manually or electronically.
c) The Preneed Ledger shall contain current data and shall be revised and updated at least once per month.
**The Preneed Ledger shall, at a minimum, contain**:
1) The name and address of each purchaser, and if different, the name and address of each intended funeral recipient;
2) The amount of moneys prepaid, including any periodic payments made by the purchaser and the dates of each payment;
3) An identification of the agreement as revocable or irrevocable:
4) The value and balance of each prepaid funeral trust fund or value of each funeral insurance policy, as of the most recent transaction, annual statement or accounting; and

5) **The location of all prepaid funds, including**:
i) The number of any bank account;
ii) The location of any passbook;
iii) The name of any insurance company receiving funds in payment for a funeral insurance policy; and
iv) The policy number, when available.
d) All other records of prepaid funeral agreements, including statements of goods and services in connection therewith and any other writings or notifications, which are required to be made by this subchapter or by the preneed statutes, shall be maintained in a single identifiable and accessible location in the registered mortuary where such prepaid funeral agreements were made.

e) **The records of prepaid funeral agreements referred to in (d) above shall accurately reflect:**
1) The amount of refunds, if any. including the name and address of the recipient of the refund and the amount thereof:
2) Any assignment or transfer of prepaid funeral agreements to any other registered mortuaries prior to the time of need, including the name of the receiving mortuaries and the dates of said transfers:
3) The death of an intended funeral recipient, including:
i) The date of death:
ii) The cost of the at need funeral arrangement;
iii) The original and any revised preneed Statement of Funeral Goods and Services Selected, and the at need Statement of Funeral Goods and Services Selected;
iv) The amount of refund or additional cost if any; and
v) The name of any person receiving a refund or paying any additional moneys.
f) The Preneed Ledger of active prepaid funeral agreements required pursuant to (a) above shall be maintained continuously for as long as the mortuary remains in business, regardless of changes in registration, ownership, managers, deaths of licensees, transfers to new locations or bankruptcy. There shall be no deletions of active prepaid funeral agreements from the Preneed Ledger for any reason other than mistaken entries. When a mistaken entry is corrected, the correction shall include the date of said correction.
g) All other records made and maintained pursuant to (d) above shall be retained for a period of seven years from the date of death of the intended funeral recipient, or the transfer, assignment, or refund of the prepaid funds, or the revocation of the preneed funeral arrangement.
h) All records required to be maintained by this section shall be made available by the provider to any authorized representative of the Division of Consumer Affairs and, upon request or as required by this subchapter, to the Board and its Executive Director.
i) The provider shall certify in the biennial renewal application of all registered mortuaries that all records maintained pursuant to this section are in existence and are available for inspection.

## XIV. STATEMENT OF CLAIM AND FACTS
## NEGLIGENT OR FRAUDULENT MISREPRESENTATION

I am the Plaintiff(s) that can establish by clear and convincing evidence each of the following elements. First, that Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs made a false representation of fact to Plaintiff(s) Karen Tucker, Casandra at Mays Funeral Home and the Camden Police Department. Second, that Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs knew or believed it to be false. Third, that Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs intended to deceive Plaintiff(s). Fourth, that Plaintiff believed and justifiably relied upon the statement and was induced by its action taken. Fifth, that as a result of Plaintiff's reliance upon the Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs statement, she sustained damage.

Plaintiff can establish and explain that a reasonable fact finder or juror could determine what Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs said to the plaintiff was a statement of fact, Defendant(s) can be held responsible under the circumstances of this case, the law does impose liability.

## XV.  STAEMENT OF CLAIM AND FACTS

Plaintiff can show entitlement to **state a claim for  3.30E Fraud--Deceit**

Plaintiff(s) finding will be that Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs made a representation of fact.   Plaintiff(s) can show Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs made a representation of fact, that was false, knew or believed it was false and made the representation with intent to deceive the plaintiff.  Plaintiff was justified in relying on the Defendant(s) Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs representation was justifiable reliance for Plaintiff that took action to find Flakewood Tucker, Jr. missing corpse; Camden Police Department justifiable reliance shows they would not file charges against Defendant(s) for Tort Action for Interference with a Dead Body, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse;  Mis delivery of human remains.

CHARGE 3.30E If Plaintiff can show that a reasonable person would have considered the representation made by Virtua Health, Inc., Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs important in deciding whether to proceed with filing criminal charges or looking to find Flakewood Tucker, Jr., corpse that Defendant(s) knew that Plaintiff(s) and Camden Police Department considered the fact important and would rely on it, and that Plaintiff's and Camden Police Department belief of the representation was a substantial factor in his/her decision to engage in finding Flakewood Tucker, Jr., corpse or declining to file criminal charges against Defendant(s) for Tort Action for Interference with a Dead Body, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr.  Missing Corpse;  Mis delivery of human remains a reasonable fact finder or juror could find verdict would be for the plaintiff and Plaintiff(s) attention would then turn to the nature and extent

of Plaintiff's damage that shows Defendant(s), Jon Doe(s) Defendant(s); Levi Coombs, III, Pamela Dabney, Alexis Coombs are liable for fifty million dollars monetary damages.

## XVI. STATEMENT OF A CLAIM AND FACTS

### Tort of Interference with a Dead Body

I am the Plaintiff that **states a claim** for **The tort of interference** with a dead body against the Defendant(s) showing it applies to intentional acts, reckless acts, and negligent acts of the undertaker like Carl Miller Funeral Home, Levi Coombs, Pamela Miller Dabney, Alexis Coombs that are Defendant(s) who negligently or recklessly  unlawfully taking of corpse, abuse of corpse, desiccation of corpse, embalmed Flakewood Tucker, Jr. a deceased person's body  without verbal nor written authorization from Plaintiff is liable for the tort if he or she harms the body or if he or she prevents the body from being properly buried or cremated.

Damages for the tort of interference with a dead body include damages for physical injuries and for emotional distress. A plaintiff does not need to sustain physical injuries in order to recover for his or her emotional distress.

Plaintiff can show cause of the tort of interference with Flakewood Tucker, Jr., dead body against all Defendant(s) include: intentional infliction of emotional distress based upon the mishandling of a corpse, negligent infliction of emotional distress based upon the mishandling of a corpse loosing corpse, unlawfully taking or possessing human remains; unauthorized autopsy or embalming, holding or refusing to release a dead body for burial to Mays Funeral Home 45 Pine Street, Willingboro, New Jersey , 08046 on Friday, February 25, 2022 the agent authorized by written, signed contract and paid in full to perform duty of funeral and burial services for Flakewood Tucker, Jr.

### CAUSE OF ACTION

Holding that Virtua Inc., Defendant(s) hospital had duty of care to turn over Flakewood Tucker's remains to his wife Anita Tucker or Daughter, Dr. Karen Tucker but recognizing that section 868 involved the tort of the wrongful infliction of emotional distress.

The circumstances of the case projected that Virtua Health, Inc., Defendant(s) had but one duty: to act reasonably in honoring the Plaintiff(s) family's legitimate request to turn over their husband and father's body to Anita Tucker and Karen Tucker or their agent May's Funeral Home located 45 Pine Street, Willingboro, New Jersey , 08046 on Friday, February 25, 2022 and breached duty of care required to do.

Plaintiff can **state a claim** against the Defendant(s) showing Virtua Hospital Our Lady of Lourdes had a **Duty of Care that was breached**: Plaintiff can show cause of action against Defendant(s) for Negligence, showing people like Defendant(s) have a duty to refrain from negligent behavior like negligent infliction of emotional distress based upon the mishandling of a corpse; intentional infliction of emotional distress based upon the mishandling of a corpse; loss of body, deceit, omission of facts, false pretense, false statements, misrepresentations to conceal Flakewood Tucker, Jr., human remains; interference with a dead body; unlawfully desecrate, damage or destroy Flakewood Tucker, Jr., human remains; abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr.  missing corpse;  Mis delivery of human remains Flakewood Tucker, Jr. human remains losing, mishandling or abuse of Flakewood Tucker, Jr. human remains—that is, if particular

53

conduct or lack of conduct that doesn't have an intent to injure others like Anita Tucker, Plaintiff and Karen Tucker, Plaintiff, but creates a foreseeable risk of injury to others like Anita Tucker, Plaintiff and Karen Tucker, Plaintiff, Defendant(s) are required (Defendant(s) have a duty) to refrain from acting in that way.

Plaintiff can **state a claim** against the Defendant(s) showing Carl Miller Funeral Home Director and agents had a **Duty of Care that was breached**: Plaintiff can show cause of action against Defendant(s) for Negligence, showing people have a duty to refrain from negligent behavior like intentional or negligent infliction of emotional distress based upon the mishandling of a corpse; intentional infliction of emotional distress; negligent infliction of emotional distress; loss of body, deceit, omission of facts, false pretense, false statements, misrepresentations to conceal Flakewood Tucker, Jr., human remains; interference with a dead body; unlawfully taking or possessing Flakewood Tucker, Jr. human remains; unlawfully desecrate, damage or destroy Flakewood Tucker, Jr., human remains; theft of body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains Flakewood Tucker, Jr. human remains—that is, if particular conduct or lack of conduct that doesn't have an intent to injure others like Anita Tucker, Plaintiff, Karen Tucker, Plaintiff, but creates a foreseeable risk of injury to others Anita Tucker, Plaintiff, Karen Tucker, Plaintiff , Defendant(s) are required (Defendant(s) have a duty) to refrain from acting in that way.

## BREACH OF DUTY OF CARE
Plaintiff **states a claim for Breach of duty of care** against the Defendant(s) that can occur when a person's like Defendant(s) conduct fails to meet an applicable standard of care. It is one of the four elements of negligence. If a reasonable fact finder or juror can find for the Plaintiff that the Defendant(s) conduct fails to meet the required standard of care, they are said to have breached that duty.

I am the Plaintiff that can show she has met her burden of proof to prove breach of duty of care against the Defendant(s) e**stablishing:**
1. The probability of harm occurring from intentional or negligent infliction of emotional distress based upon the mishandling of a corpse; intentional infliction of emotional distress; negligent infliction of emotional distress; loss of body, deceit, omission of facts, false pretense, false statements, misrepresentations to conceal Flakewood Tucker, Jr., human remains; interference with a dead body; unlawfully taking or possessing Flakewood Tucker, Jr. human remains; unlawfully desecrate, damage or destroy Flakewood Tucker, Jr., human remains; theft of body, abuse of corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse; Mis delivery of human remains Flakewood Tucker, Jr. human remains.

## 2. Seriousness of the harm Defendant(s) caused Plaintiff should it occur:
NEGLIGENCE; , 4.43 Consumer Fraud Act NJSA 56:8-1 et seq
3.30E FRAUD — DECEIT; Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse;
Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse; Mis delivery of human remains;

54

3. **Plaintiff can show the utility of the Defendant(s) activity** shows Carl Miller Funeral Home, Defendant(s) deception, concealment of body shows they willfully, intentionally and knowingly more likely than not did unlawfully take Flakewood Tucker, Jr body knowingly without authorization because the financial gain outweighed the notion that they would not benefit monetarily from grieving Plaintiff's longing for the opportunity to see their beloved Flakewood Tucker, Jr. and pay money to Defendant(s) to provide funeral services, transportation, pay for embalming, casket, and a proper burial service is a **statement of a claim for  stated with particularity, NJ Consumer Fraud Act and 3.30 Fraud-Deceit.**
4. **cost of precautions.**

I am the Plaintiff that states that:
(1) a tort is a civil wrong committed by one person like Virtua Health, Defendant(s) and Carl Miller Funeral Home Defendant(s) against another like Tucker, Plaintiff's; and
(2) torts can and usually do arise outside of any agreement between the parties.

**Compensation**:  The overall purpose of tort law is to compensate plaintiffs for unreasonable harm which they have sustained.
a. Societal standard:  The unreasonableness of the harm is generally measured from a broad "social utility" standpoint. For instance, in determining whether the defendant's conduct is "negligent," the social utility of that conduct (e.g., running a railroad) plays an extremely important role.
b. Economic efficiency:  When the law takes into account the "social utility" of the defendant's conduct, courts are to some extent trying to achieve economic efficiency. That is, they try to impose on the defendant an incentive to make sure that the costs associated with her activities do not outweigh the benefits from those activities. Normally, a defendant will not engage in conduct whose costs outweigh its benefits anyway; tort law addresses those cases where the defendant gets the benefits, but the costs are imposed on third parties.
Example:  Assume that D is a driver who is running ten minutes late for an important – and potentially lucrative – business meeting. If D does not face civil liability for driving at 70 m.p.h., and feels that he is completely protected by his airbag, he is likely to speed – all of the benefits from speeding will accrue to him (he gets to the meeting on time, and gets to make the business deal), and the big potential costs from the activity are likely to be imposed on others (e.g., the pedestrian he may run over). Even if the expected financial benefit to D from speeding in this case is fairly small (say, $1,000), and the expected "cost" to others from the speeding is higher (e.g., $200,000 estimated cost of injury to a pedestrian if one is hit, times, let's say, a 1% chance of such an accident occurring, for an expected value of $2,000), D will still have an incentive to speed. Making D responsible for the cost to others from his activity thus induces D to behave "efficiently" (here, by refraining from conduct that has an expected "benefit" of $1 000 versus expected "cost" of $2,000).

Plaintiff has met her burden of proof to statement of a claim for breach of duty of care against Defendant(s) showing Harm to Plaintiff's must be a "reasonably foreseeable" result of the Defendant(s conduct; Plaintiff has shown a relationship of "proximity" exist between the Defendant(s) and the Tucker, Claimant; Plaintiff can show she is entitled to civil suit against Defendant(s) is "fair, just and reasonable" to impose liability.

Plaintiff states a claim for breach of duty of care against Defendant(s) showing the Defendant(s) could foresee the risk of harm to the Plaintiff delaying care caused death; loosing and abusing Flakewood Tucker, Jr human remains was the proximate cause of statement of claim against Defendant(s) for Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional

Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse; Mis delivery of human remains and that the Defendant(s) failed to prevent the harm to Plaintiff from occurring.

Plaintiff states a claim for breach of duty of care against Defendant(s) showing the Defendant(s) could foresee the risk of harm to the Plaintiff by Defendant(s) abuse of corpse and unlawfully taking the human remains of Flakewood Tucker without authorization was the proximate cause of statement of claim against Defendant(s) for Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse; Mis delivery of human remains and that the Defendant(s) and failed to prevent the harm to Plaintiff from occurring.

I am the Plaintiff that has met burden of proof to prove a statement of a claim against Defendant(s) for breach of duty showing the Defendant(s) had a duty of care, Plaintiff has establish the Defendant(s) failed in their obligation to exercise reasonable care and that the Defendant(s) breach of duty of care was the proximate cause of harm to Plaintiff for statement of claim against Defendant(s) for Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse; Mis delivery of human remains and that the Defendant(s) shows Defendant(s) are liable for fifty million dollars monetary damages, compensatory damages, economic and earning capacity damage, emotional damages, treble damage, punitive damages, relief, summary judgment Rule 56, extraordinary relief and any alternative relief the court deems both just and proper to allow this complaint to proceed for jury trial demand heard on the merits.

**NEGLIGENCE**
I am the **Plaintiff that states a claim under New Jersey law, for negligence** against the Virtua Health, Inc., Dennis, Pulliam, Jon Doe(s) Defendant(s); Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) that shows the Defendant(s) party's failure to act as a reasonable person would, or failure to exercise the "degree of care for the safety of others" which a "person of ordinary prudence" would exercise under "similar circumstances." NJ Model Jury Charge (Civil) 5.10A "Negligence and Ordinary Care - General" (1984).

I am the Plaintiff that can show she has met her burden of proof to prove a **statement of a claim for negligence against Defendant**(s) established by a preponderance of the evidence. Plaintiff can show Virtua Health, Inc., Dennis, Pulliam, Jon Doe(s) Defendant(s); Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) owed the Plaintiff(s) a duty of care, meaning

the Defendant(s) had an obligation to act as a reasonable person would under the circumstances vis-a-vis the Plaintiff(s).  Plaintiff(s) can show that the Virtua Health, Inc., Dennis, Pulliam, Jon Doe(s) Defendant(s); Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) breached the duty of care, or failed to act as a reasonable person would have.  Plaintiff can show Virtua Health, Inc., Dennis, Pulliam, Jon Doe(s) Defendant(s); Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) were the proximate cause statement of claim against Defendant(s) for Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body, Negligent misrepresentation, Fraudulent Misrepresentation, Breach of Duty of Care, Unlawfully Taking or Possessing Flakewood Tucker, Jr. Human Remains; Unlawfully Desecrate, Damage or Destroy Flakewood Tucker, Jr., Human Remains; Theft of Body, Abuse of Corpse, Mutilation of corpse, Misplacement, Misidentification or Uncertainty about the Whereabouts and Fate of Flakewood Tucker, Jr. Missing Corpse;  Mis delivery of human remains  shows Plaintiff(s) can prove a link between the Virtua Health, Inc., Dennis, Pulliam, Jon Doe(s) Defendant(s); Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) breach of the duty of care. and causation of the plaintiff's injury and harm.  I am the Plaintiff(s) that has met burden of proof to prove the Intentional Infliction of Emotional Distress Based Upon the Mishandling of a Corpse, Negligent Infliction of Emotional Distress Based Upon the Mishandling of a Corpse; Tort Action for Interference with a Dead Body and financial losses that the Plaintiff(s) has suffered as a result of the Virtua Health, Inc., Dennis, Pulliam, Jon Doe(s) Defendant(s); Carl Miller Funeral Home, Levi Coombs, Pamela Dabney, Alexis Coombs and Jon Doe(s) Defendant(s) negligence, as these losses and harm will be the basis for any damages that the jury may award to compensate the Plaintiff(s) for the harms and losses suffered.  Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013).

Dr. Robbins testified that in the circumstances that confronted defendant Pirolli, it was "unthinkable" that there were no forms for the parents to sign to effectuate release of the body, and that if the hospital did not have such forms, then Pirolli "should have on the instant arranged some kind of writing that he could provide for the hospital in order that releases could be signed."

We take the expert's testimony to mean that if a hospital is going to insist on forms and procedures, then it should have them available and in place, or at the least improvise *531 them on the spot, in order to fulfill its underlying obligation to take reasonable steps to release the body to the next of kin. 531 That there is such an underlying obligation is no longer open to question. For more than half a century this state has recognized a quasi-property right in the body of a dead person. "[I]t is now the prevailing rule * * * that the right to bury the dead and preserve the remains is a quasi-right in property, the infringement of which may be redressed by an action in damages." Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90 , 93 (Sup.Ct. 1936).

I am the Plaintiff that can show the tort contemplates the wrongful infliction of mental distress. Ibid.; see Restatement (Second) of Torts § 868 comment a (1977); Annotation, Liability for Withholding Corpse, 48 ALR 3d 240, 252-53 (1973). However it may be denominated, the cause of action is firmly in place.

Although the Appellate Division recognized that cause of action as a quasi-property right Plaintiff can show Flakewood Tucker, Jr. was pronounced dead at 6:20 am on Tuesday, February 22, 2022 and Virtua Hospital had no records to show when or to whom his corpse was released to for burial from Tuesday February 22, 2022 - Monday Feb. 28, 2022.

Plaintiff can argue she has met her burden of proof to prove that a reasonable fact finder or juror could find that there was ample support in the evidence that Virtua Health, Inc., Defendants had "negligently released the body without authorization and loss the body because they could not find Flakewood Tucker, Jr. corpse nor any documents that showed he was a patient that died at Virtua Inc.. Defendant(s) Our Lady of Lourdes hospital according to Virtua Health, Inc. Jon Doe(s) Defendant(s) Mr. Nettles, CEO on Friday, February 25-28, 2022 and his assistant Tracey Collins told Karen Tucker, Plaintiff she would have to find him on her own is outrageous.

Carl Miller Funeral Home, Defendant(s) theft of body of Flakewood Tucker, Jr., corpse from Virtua Health, Inc., Defendant(s) Our Lady of Lourdes hospital was without verbal nor written authorization and embalmed my father.  He was so black he was almost unrecognizable. Mays Funeral Home offered a contract to Plaintiff's on Friday. February 25. 2022 that was entered. agreed and paid in total.  Mays Funeral Home went to Virtua Hospital Our Lady of Lourdes on Friday, February 25, 2022 and was told they had no records of Flakewood Tucker being a patient nor holding a corpse for pick up and burial.

On Monday, February 28, 2022, Karen Tucker, Plaintiff discovered Carl Miller Funeral Home, Defendant(s) stated they picked Flakewood Tucker body up by accident, they did not embalm him, and Karen Tucker, Plaintiff to could come pick him up.  May's Funeral Home Director informed Plaintiff that they would pick my Dad up as we were just devastated and had no idea how we were going to go get him. When Mays Funeral Home went to pick him up he had a 2cm x 1cm forehead injury that was not present at time of death that Plaintiff will present pictures as exculpatory material evidence.  When Mays Funeral Home retrieved Flakewood Tucker's body he was embalmed without Plaintiff's authorization.  Plaintiff's filed a police report in Marlton, NJ and Camden, NJ against Defendant(s) for body snatching, negligent mishandling of corpse Flakewood Tucker without authorization so as to prevent his proper burial.

Virtua Health, Inc., Defendant(s) negligently made false statement, negligent and fraudulent misrepresentations it intended Plaintiff to rely upon that Flakewood Tucker, Jr. was never a patient, did not die at Virtua Health Inc., Defendant(s) Our Lady of Lourdes hospital and was not missing from the morgue was reported to Plaintiff's that Flakewood Tucker, Jr. was never a patient, they had no records of him as a living patient, no morgue record and security log records shows Plaintiffs distress would flow from the breach of a duty owed to them that turned out to be false statement, fraudulent and negligent misrepresentation that destroyed Plaintiff's mentally, not one owed to Flakewood Tucker, Jr. See, e.g., Molien v. Kaiser Found. Hosps., 27 Cal.3d 916, 616 P.2d 813, 167 Cal.Rptr. 831 (1980) (recognizing broader standard *536 of foreseeability for direct victim whose wife was negligently and incorrectly diagnosed as having syphilis, leading to the destruction of the marriage); cf. Hume v. Bayer, 178 N.J. Super. 310 (Law Div. 1981) (parents of boy with mildly infected appendix could recover for intentional infliction of emotional distress resulting from being told, knowingly and maliciously, that condition was cancerous).

Strachan v. John F. Kennedy Memorial Hosp 109 N.J. 523 (N.J. 1988)
 Two exceptions have generally been recognized: the
first involves negligent transmission of a message concerning a relative, and the second pertains to negligent mishandling of a corpse. Note, Negligent Infliction of Emotional Distress:
Reconciling the Bystander and Direct Victim Causes of Action, 18 U.S.F.L.Rev. 145, 147-48 (1983).

https://www.casebriefs.com/blog/law/torts/torts-study-buddy/emanuel-law-outline/chapter-1-introduction/introduction-28/

http://www.bitsoflaw.org/tort/negligence/study-note/degree/breach-of-duty-standard-reasonable-care

I am the Plaintiff that states a claim against the Defendant(s) for negligence.  I am the claimant that can show on the balance of probabilities that: the Defendant(s) owed Plaintiff's a duty of care, breached that duty by failing to meet the standard of care required and as a result the claimant suffered loss or damage which is not too remote.

I am the Plaintiff that can show Breach of duty requires the Defendant(s) to have been at fault by not fulfilling their duty towards the claimant:

**Reasonable man**

As a general rule, the standard of care required is an objective one, that of a reasonable man.

- **BLYTH V BIRMINGHAM WATERWORKS (1856) 11 EXCH 781**

Baron Alderson: .. Negligence is the omission to do something, which a reasonable man, guided upon those considerations, which ordinarily regulate the conduct of human affairs, would do, or doing something, which a prudent and reasonable man would not do. The standard demanded is thus not of perfection but of reasonableness. It is an objective standard taking no account of the defendant's incompetence - he may do the best he can and still be found negligent....

The reasonable man is now often referred to as the reasonable person and has been described by judges in many memorable ways in cases.

- **HALL V BROOKLANDS AUTO-RACING CLUB [1933] 1 KB 205**

Greer LJ: .. the man on the Clapham omnibus....

- **MCFARLANE V TAYSIDE HEALTH BOARD [1999] 3 WLR 1301**

Lord Steyn: .. commuters on the London Underground....

The reasonable person test is an objective one: What would a reasonable person have foreseen in the particular circumstances? Therefore, the defendant is required to take as much care as a reasonable person in his position.

- **GLASGOW CORP V MUIR [1943] AC 448**

Lord MacMillan: .. standard of foresight of the reasonable man is, in one sense, an impersonal test. It eliminates the personal equation and is independent of the idiosyncrasies of the particular person whose conduct is in question....

**Risk**

A reasonable person would consider the possible risk when deciding to act in a certain way and in determining the standard of care required. The magnitude of risk should be considered. This means taking into account the likelihood that the defendant's conduct could cause damage or injury and how serious that damage or injury would likely to be.

**Likelihood of injury or damage**

In looking at risk, the likelihood of injury or damage should be considered. Generally, the less likely injury or damage may be caused, the lower the standard of care required.

- **BOLTON V STONE [1951] AC 850**

**FACTS:**

59

The plaintiff was hit by a cricket ball which came from the defendant's cricket club. The cricket ground had a five metre high protective fence. Only approximately six balls had been hit out the ground in a number of years and there had never been any injuries caused.

**ISSUE:**

Did the risk mean that the defendant had breached their duty of care?

**HELD:**

The risk of injury caused by a ball being hit out of the ground was minimal, the defendant had taken preventative measures and a reasonable person would not have anticipated the injury caused. Therefore, the defendant had not breached the duty of care as it had reached the standard of care required.

- **MILLER V JACKSON [1977] QB 966**

**FACTS:**

The plaintiffs house was damaged on several occasions by cricket balls from the defendant's cricket club. Approximately six to ten balls were hit out of the ground each season, despite the defendant erecting a five meter protective wall.

**ISSUE:**

Did the magnitude of the risk mean the defendant had breached their duty of care?

**HELD:**

The defendants were in breach of the standard expected of the reasonable person. The frequency of the problems meant that the defendant should have taken more steps to stop the cricket balls. The risk was much greater in this case than in Bolton v Stone [1951].

However, it may not always be reasonable to ignore a small risk.

- **HALEY V LONDON ELECTRICITY BOARD [1965] AC 778**

**FACTS:**

The plaintiff a blind man, was injured when he tripped over a hammer on a pavement, left by workmen employed by the defendant. The hammer was left to warn people that a hole had been dug in preparation for underground work, which was common practice at the time.

**ISSUE:**

Did the magnitude of the risk mean the defendant had breached their duty of care?

**HELD:**

The House of Lords found that it was reasonably foreseeable that unaccompanied blind pedestrians may walk that route and therefore the defendant should have taken extra precautions. The reasonable person should not ignore the risk to blind pedestrians, especially due to the gravity of the potential injury and the limited cost of more robust precautions.

**Seriousness of injury or damage**

The seriousness of possible injury or damage caused should also be taken into account by a reasonable person. The more serious the potential injury, the greater the standard of care required. Similarly, if the defendant is aware that a particular individual is at an enhanced risk of serious injury, this too increases the obligation to take care.

**PARIS V STEPNEY BOROUGH COUNCIL [1951] AC 367**

**FACTS:**

The plaintiff had an accident in which he lost his sight in one eye, while working as a mechanic for the defendant, a local authority. Prior to the incident, the defendant knew that the plaintiff was already blind in one eye. The injury may have been prevented if the plaintiff had been provided with protective goggles to wear at work.

**ISSUE:**

Did the defendant's knowledge of the plaintiff's existing disability increase the standard of care required?

**HELD:**

The House of Lords found that the probability of the injury occurring was very small, but its consequences were very serious. Therefore, the defendant should have taken extra care to provide goggles for the plaintiff.

**Precautions**

The courts will consider the cost and practicality of measures the defendant could have adopted in order to prevent the injury or damage. The defendant is likely to have acted unreasonably if the risk would have been substantially reduced at a low cost and the defendant failed to take the necessary precautions. However, if the precautions would only produce a very limited reduction in the risk and cost a lot, then a defendant is more likely to have acted reasonably. Essentially, the greater the risk of injury, the greater the requirement to take precautions. A lack of resources is not usually accepted as defence for the defendant failing to exercise reasonable care.

- **LATIMER V AEC LTD [1953] AC 643**

**FACTS:**

> The plaintiff injured his ankle after slipping on an oily floor in the defendant's factory. The oily floor was due to water damage from an exceptionally heavy storm. The defendant had put up warning signs, informed staff of the dangers and used all available sawdust and sand to soak up liquid.

**ISSUE:**

Had the defendant taken all necessary precautions?

**HELD:**

The defendant had taken all reasonable steps to prevent an accident in the circumstances. The only alternative would have been to close the factory, which was not a practical or reasonable solution.

- **HALEY V LONDON ELECTRICITY BOARD [1965] AC 778**

**FACTS:**

The plaintiff, a blind man, was injured when he tripped over a hammer on a pavement, left by workmen employed by the defendant. The hammer was left to warn people that a hole had been dug in preparation for underground work, which was common practice at the time.

**ISSUE:**

Could the defendant reasonably have taken more precautions?

**HELD:**

The House of Lords found that further precautions, for example erecting a fence around the hole would have significantly reduced the risk of injury at a low cost. The defendant had not taken all practical precautions and therefore was in breach of the standard of care required.

**Defendant's purpose**

The greater the social utility of the defendant's conduct, the less likely it is that the defendant will be held to be negligent. If the defendant's activity has no social utility or is unlawful, the defendant will be required to exercise a very high degree of care to justify even a small risk of harm to others.

- **DABORN V BATH TRAMWAYS MOTOR CO. LTD [1946] 2 ALL ER 333**

**FACTS:**

During World War II, the plaintiff was injured in a collision with the defendant's ambulance. The ambulance was a left-hand drive vehicle which was not fitted with signals. The accident happened when the defendant turned after attempting to signal with her hand.

**ISSUE:**

Did the defendant's purpose lower the standard of care required?
**HELD:**
The Court of Appeal found that converting the left-hand drive vehicles would have been prohibitively difficult and expensive. By providing an ambulance service during wartime, the defendant was acting in public interest and this value to society meant that there was a lower standard of care required.
Asquith LJ: .. if all the trains in this country were restricted to a speed of five miles an hour, there would be fewer accidents, but our national life would be intolerably slowed down. The purpose to be served if sufficiently important, justifies the assumption of abnormal risk....

- **WATT V HERTFORDSHIRE COUNTY COUNCIL [1954] 1 WLR 835**

**FACTS:**
The plaintiff, a fire fighter, was injured by heavy lifting equipment needed to assist at a serious road accident, which had slipped off the back of a vehicle. The fire officer, employed by the defendant, had ordered the use of an ordinary lorry to carry the equipment as the usual vehicle was engaged in other work at the time.
**ISSUE:**
Had the defendant breached their duty of care by allowing an ordinary lorry to carry the equipment?
**HELD:**
The court found that the benefit of saving the woman trapped in the accident was greater than the risk of injuring the fire fighters by using an unsuitable lorry for carrying the equipment. Therefore the defendant had reached the standard of care required.
Lord Denning: .. in measuring due care one must balance the risk against the measures necessary to eliminate the risk... the saving of life or limb justifies taking considerable risk ....
However, the nature of the work of the emergency services does not make them immune from Negligence claims.

- **ARMSDEN V KENT POLICE [2009] EWCA CIV 631**

**FACTS:**
A was driver killed in a collision with the defendant's police car. The police car was driving fast to attend an incident and did not use the car's siren when approaching a junction with a side road, where the accident occurred.
**ISSUE:**
Had the defendant taken reasonable care?
**HELD:**
The Court of Appeal found the driver of the police car was in breach of his duty of care, by failing to use his siren.
**Sport**
It is well established that a participant in sport owes a duty of care to other participants and also to spectators. Furthermore, sport is viewed as a socially desirable activity and there is an acceptance that participation brings some risks, which may be justified. Therefore, the standard of care required in the context of sports is assessed on this basis.

- **CONDON V BASI [1985] 1 WLR 866**

**FACTS:**
The plaintiff's leg was broken in a tackle by the defendant during a local league football match.
**ISSUE:**
Had the defendant breached the necessary standard of care?
**HELD:**

The defendant's tackle was reckless and therefore he was in breach of the standard of care expected of a local league player.

Sir John Donaldson MR: .. The standard is objective, but objective in a different set of circumstances. Thus there will of course be a higher degree of care required of a player in a First Division football match than of a player in a Fourth Division football match....

- **WILKS V CHELTENHAM CYCLE CLUB [1971] 1 WLR 668**

**FACTS:**

The plaintiff was injured when he was a spectator at a motorcycle race. The defendant's motorbike came off the track and hit the plaintiff.

**ISSUE:**

What was the standard of care owed by the defendant?

**HELD:**

The standard of care required should take account of the defendant's desire to win.

Edmund Davies LJ: .. although in the very nature of things the competitor is all out to win and that is exactly what the spectators expect of him, it is in my judgment still incumbent upon him to exercise such degree of care as may reasonably be expected in all the circumstances. For my part, therefore, I would hold him liable only for damages caused by errors of judgment or lapse of skill going beyond such as, in the stress of circumstances, may reasonably be regarded as excusable....

*Common practice*

Generally, compliance with accepted practice within a trade or profession provides the defendant with a good argument that he has met the required standard of care. However, it does not necessarily mean a defendant's conduct is not negligent. Non-compliance with statutory standards, regulations and Codes of Practice is not necessarily evidence of negligence but can mean that a defendant is liable for the tort of breach of statutory duty.

**RE THE HERALD OF FREE ENTERPRISE (1987)**

**FACTS:**

In the Zeebrugge ferry disaster, 193 passengers and crew were killed and hundreds more injured when the ship capsized. The defendant, the captain, set sail with the bow doors open. This led to water entering the ship, however, it was common practice at the time.

**ISSUE:**

Was the common practice in breach of the required standard of care?

**HELD:**

The defendant's actions were negligent, despite the fact it was commonplace.

*Current state of knowledge*

The current state of knowledge must be used to determine what a reasonable person, in the defendant's situation, could have foreseen.

**ROE V MINISTER OF HEALTH [1954] 2 QB 66**

**FACTS:**

The plaintiffs were paralyzed after spinal anesthetics administered to them were contaminated through invisible cracks in the glass vial. The defendant employed the anesthetists. At the time, the risk of this happening was not appreciated by competent anesthetists in general and such a contamination had not happened before.

**ISSUE:**

Had the required standard of care been met?

**HELD:**

Although clearly in 1954, when the case was heard the problem was understood, the defendant must be judged by the state of knowledge at the time, in 1947. Therefore, the duty of care owed by the hospital to the patient had not been broken.

Denning LJ: .. the court must not look at the 1947 accident with 1954 spectacles....

**Limitations**

There are some limitations on the meaning of the term reasonable.

- **FARDON V HARCOURT-RIVINGTON [1932] ALL ER 81**

FACTS:

The plaintiff, a passer-by, lost his eye after it was damaged by a splinter of glass from the defendant's car. The defendant had left his dog inside his car and the dog had jumped around, in an out of character way, this had damaged the car and caused the splinter.

ISSUE:

Had the defendant acted reasonably?

HELD:

The defendant had not acted unreasonably and therefore, the plaintiff could not recover damages.

Lord Dunedin: .. People must guard against reasonable probabilities but they are not bound to guard against fantastic possibilities....

- **CARMARTHENSHIRE CC V LEWIS [1955] AC 549**

FACTS:

The plaintiff's husband, a lorry driver, was killed when he swerved to avoid hitting a child in the road. The child wandered onto the road when under the care of a nursery run by the defendant, the local council. The plaintiff sought damages from the council.

ISSUE:

Had the defendant acted unreasonably?

HELD:

The event was rare but it was a reasonably possible and therefore the defendant was liable. The defendant should have taken precautions in the playground design.

- **MANSFIELD V WEETABIX [1998] 1 WLR 1263**

FACTS:

The plaintiff's shop was damaged when the defendant drove his lorry into the front of the building. The defendant lost control of his vehicle as he was suffering from a medical condition that he was unaware of at the time.

ISSUE:

What standard of care should apply to the defendant?

HELD:

The defendant will not be in breach if he has met the standard of the reasonable driver who is unaware of his condition.

Leggatt LJ: .. To apply an objective standard in a way that did not take account of [the driver's] condition would be to impose strict liability. But that is not the law....

**Special Standards**

Special standards of care may apply, which take into account the special characteristics of the defendant.

**Skilled defendant**

A skilled defendant will be required to carry out a task to the standard of a reasonable skilled person.

- **BOLAM V FRIERN HOSPITAL MANAGEMENT COMMITTEE [1957] 2 ALL ER 118**

FACTS:

The plaintiff suffered an injury after receiving treatment at the defendant's hospital. There was inconclusive debate between medical experts about whether the treatment had been administered in the safest way.

**ISSUE:**

What standard of care is required?

**HELD:**

A junior doctor must show the same degree of skill as a reasonable doctor. Furthermore, the Bolam test means that a doctor is not in breach of his duty if he acted in accordance with a practice accepted as proper by a responsible body of medical opinion.

McNair J: ..A man need not possess the highest expert skill; it is well established law that it is sufficient if he exercises the ordinary skill of an ordinary competent man exercising that particular art....

- **BOLITHO V CITY AND HACKNEY HEALTH AUTHORITY [1997] 4 ALL ER 77**

**FACTS:**

The plaintiff was the mother of the victim, a two year old child, who suffered serious brain damage following respiratory failure and eventually died at the defendant's hospital. The child was taken to the hospital, however a doctor did not attend (due to a technology failure) until after the victim died . The plaintiff argued that the doctor should have attended and carried out a specific procedure, which would have saved the victim's life. The doctor testified that she would not have carried out the procedure even if she had attended and her evidence was backed by a number of medical professionals.

**ISSUE:**

Had the defendant breached their duty of care?

**HELD:**

The trial judge applied the Bolam test and found that there was no breach of duty. However, on appeal to the House of Lords, it was established that a court may reject the accepted practice of a profession, if it can be shown that the practice is not logically supportable.

Lord Browne-Wilkinson: .. the court is not bound to hold that a defendant doctor escapes liability for negligent treatment or diagnosis just because he leads evidence from a number of medical experts who are genuinely of the opinion that the defendant's treatment or diagnosis accorded with sound medical practice....

**Under-skilled defendant**

The court will determine the standard of care required for the relevant activity in each case.

- **WELLS V COOPER [1958] 2 QB 265**

**FACTS:**

The plaintiff was injured after falling down the steps leading to the defendant's door. The defendant had fitted the door handle in which came away in the plaintiff's hands, causing the accident.

**ISSUE:**

Did the defendant meet the appropriate standard of care?

**HELD:**

The defendant had executed the work to the appropriate standard, when judged against the standards of a reasonably competent amateur carpenter. This standard is clearly lower than would be expected of a professional carpenter working for reward. It was also noted that this was the sort of job that a reasonable householder might do for himself. However, if a defendant attempts a job which exceeds his capability and usually requires professional work then it may be negligent for the defendant to have even undertaken the work.

Generally, inexperience does not lower the required standard of care.

- **WILSHER V ESSEX AREA HEALTH AUTHORITY [1987] QB 730**

**FACTS:**

65

The plaintiff was a baby that had been left blinded by treatment in the defendant's hospital. The plaintiff was born prematurely and a junior doctor had negligently administered excess oxygen, which caused the injury.
**ISSUE:**
What is an appropriate standard of care for a junior doctor?
**HELD:**
The House of Lords agreed with the Court of Appeal finding that the defendant had fallen below the required standard of care. A junior doctor is expected to show the level of competence of any other doctor in the same job. A patient's legitimate expectation of competent treatment is not altered by the experience of the doctor. An inexperienced doctor should ask for expert assistance if the task is beyond his ability. Policy reasons may exist for not taking into account the defendant's inexperience.

- **NETTLESHIP V WESTON [1971] 3 ALL ER 581**

**FACTS:**
The plaintiff was injured when the defendant, a learner driver, crashed into a lamppost
.
**ISSUE:**
What is an appropriate standard of care for a learner driver?
**HELD:**
A learner driver must reach the standard of the reasonably competent driver. Liability insurance is compulsory for all drivers and, therefore, the additional risk that learner drivers create is accounted for by higher premiums for inexperienced drivers.
Therefore, a court will determine the standard of care required for each activity individually. The defendant cannot argue a lower standard of care applies due to his lack of skill. For a defendant who purports to be skilled, for example a doctor, a higher standard of care may apply. A defendant who does not claim a professional skill but is carrying out work requiring certain skills, must still meet the minimum standard required by the task undertaken. If he undertakes a task which is well beyond his capabilities that may be negligent in itself.
**Children**
Child defendants will be expected to show such care as can reasonably be expected of an ordinary child of the same age.

- **MULLIN V RICHARDS [1998] 1 WLR 1304**

**FACTS:**

The plaintiff's sight was damaged during a 'sword fight' with the defendant. The 15 year old children had been play fighting with plastic rulers, one snapped causing the injury.

**ISSUE:**
Did the child defendant reach the required standard of care?
**HELD:**
There was insufficient evidence that the accident had been foreseeable so the defendant was not liable. However, the court established that the relevant factor is age when determining the standard of care required for child defendants.
Hutchison LJ : .. the question for the judge is not whether the actions of the defendant were such as an ordinarily prudent and reasonable adult in the defendant's situation would have realized gave rise to a risk of injury, it is whether an ordinary, prudent and reasonable 15-yearold schoolgirl in the defendant's situation would have realized as much....
Very young children are rarely found to be liable but older children may be held to the standard of care required of a reasonable adult.

- **GORELY V CODD [1967] 1 WLR 19**

**FACTS:**

The plaintiff was injured by an air rifle pellet. The defendant, a 16 year old boy, shot the plaintiff accidentally when larking about.

**ISSUE:**

What was the required standard of care?

**HELD:**

The defendant was found liable as he was expected to meet the standard of care required for a reasonable adult.

**(4) a demand for the relief sought, which may include relief in the alternative or different types of relief.**

1. I am the Plaintiff that demands relief, extraordinary relief, alternative relief, damages sought against the Defendant(s) for claims of : negligence, breach of duty of care, intentional infliction of emotional distress based upon the mishandling of a corpse; negligent infliction of emotional distress based upon the mishandling of a corpse; Tort Action for Interference with a Dead Body, unlawful taking or possessing Flakewood Tucker, Jr. human remains; unlawful desecration of Flakewood Tucker, Jr., human remains; theft of human body, abuse of corpse, Mutilation of corpse,  Negligent Misrepresentations, Fraudulent Misrepresentations, Misplacement, Misidentification or Uncertainty about the whereabouts and fate of Flakewood Tucker, Jr. missing corpse;  Mis delivery of human remains; 4.43,Consumer Fraud Act NJSA 56:8-184, and 3.30E FRAUD — DECEIT that include different types of relief includes the following:

(a). monetary damages in the amount that exceed $50, 000,000 million dollars

(b). compensatory damages,

(c). economic damages and earning capacity loss damages that exceeds $2,000,000 million dollars

(d). intentional infliction of emotional distress based upon the mishandling of a corpse;

(e). negligent infliction of emotional distress based upon the mishandling of a corpse;

(f). Tort Action for Interference with a Dead Body

(g). punitive damages,

(h). treble damages,

(i). fees, costs

(j). summary judgment Rule 56

(k). and any further alternative damages, relief, and extraordinary relief this court deems both just and proper to prevent manifest injustice and miscarriage of justice to achieve justice;

(l). Jury trial demand YES Oral argument YES  Evidentiary hearing YES;

(m). Rule 38 – Right to a Jury Trial; Demand (a) Right Preserved. The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate.

(n). I am the Plaintiff party that is entitled to summary judgment against the Defendant(s) demonstrating that "there is no genuine dispute as to any material fact and Plaintiff is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

67

(o).  I am the Plaintiff that states a genuine dispute about a material fact exists "against the Defendant(s) showing the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On cross-motions for summary judgment, the Court draws inferences "in favor of the party against whom the motion under consideration is made." Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727, 869 F.3d 610, 616 (7th Cir. 2017).

## CONCLUSION
**We want a public apology posted in the Philadelphia Inquirer, Courier Post, NJ Star Ledger and the New York Post.**

## What do Plaintiff(s) want?

1.  $50,000,000.00 million dollars monetary damages and relief

2.  Punitive damages and Permanent Injunction to punish Virtua Health Inc., Defendant(s) and Carl Miller Funeral Home Defendant(s) from causing irreparable harm, intentional infliction of emotional distress based on mishandling of corpse;  negligent infliction of emotional distress based on mishandling of corpse and mental anguish to families suffering the death of a loved one and as a collateral consequence a missing body of the deceased.

3.  Jury Trial Demand  **YES**        Oral Argument **Yes**        Discovery and Interrogatories  **Yes**

I declare under penalty of perjury that the foregoing is true and correct.

Date:  February 22, 2023

*Karen Tucker, electronic signature*
**Karen Tucker, pro se plaintiff(s)**
One Brynwood Avenue
Marlton, NJ 08053
(609) 923-8086
helpme2plz@yahoo.com

68